### In re CONVERGENT TECHNOLOGIES SECURITIES LITIGATION.

#### No. C–84–20749–RPA.

United States District Court,
N.D. California.

Oct. 28, 1985.

William S. Lerach, John E. Grassberger, Blake M. Harper of Milberg, Weiss, Bershad, Specthrie & Lerach, San Diego, Cal., and Leonard Barrack, Gerald R. Rodos, Edward M. Gergosian of Barrack, Rodos &

Bacine, Philadelphia, Pa., for plaintiffs Peter Gottlieb on behalf of himself and all others similarly situated.

Douglas M. Schwab, Lawrence W. Keeshan, Richard Dangerfield, Jane W. Ellis, and Kevin R. Johnson, of Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendants Thomas J. Cable, A. Robert Towbin and William J. Rollnick.

Steven M. Schatz, Bruce G. Vanyo and Daniel Bergeson of Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Cal., and Lawrence B. Pedowitz, Wendy P. Rosenthal of Wachtell, Lipton, Rosen & Katz, New York City, for defendants Burroughs Corp.

Michael F. Perlis, Philip F. Atkins-Pattenson, Pamela J. Roberts, Alvin L. Fishman of Pettit & Martin, San Francisco, Cal., for defendants Merrill E. Newman, Allen H. Michels, Robert A. Garrow, William A. Harris, Richard G. Meise, and Convergent Technologies, Inc.

### ORDER

WAYNE D. BRAZIL, United States Magistrate.

The principal [1] issue in this discovery dispute can be simply framed: *when* (at which juncture in the pretrial period) should plaintiffs answer "contention" [2] interrogatories served by defendants. The parties do *not* disagree about *whether* the questions should be answered. The sole question is when.

Counsel already have spent upwards of *$40,000* of their clients' money on this *one discovery dispute.*[3] That fact strikes this court as strong evidence that there has been in this case a major breakdown in what is supposed to be the self-executing system of pretrial discovery. The spirit of Rule 26,[4] as amended in 1983, has been

---

1. This opinion as originally issued included a section which imposed sanctions. Because that section was under reconsideration, it has not been published. If published, it will be published separately.

2. The Court discusses various definitions of "contention interrogatory", *see infra* p. 332.

3. The 40,000 figure does *not* include money counsel spent drafting, serving and initially objecting to the interrogatories themselves. The amount of money counsel have spent on this dispute is especially distressing in light of the fact that the briefs submitted do not substantially advance the analytical ball on the principal issue: i.e., *when* the interrogatories should be answered. None of the parties have spelled out, in anything like the detail that the court would find helpful, why it would promote interests served by the Federal Rules of Civil Procedure to have certain questions answered at one stage of the pretrial rather than at some other stage. The court was forced to press for answers to this pivotal question during oral argument. And in writing this opinion, the court has had to go well beyond the materials submitted by the parties to arrive at answers that are at least arguably more than simple-minded.

4. The following provisions were added to Rule 26 in 1983. Subparagraph (b)(1) was amended to include this paragraph:

> The frequency or extent of use of the discovery methods set forth in subdivision (a) shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation. The court may act upon its own initiative after reasonable notice or pursuant to a motion under subdivision (c).

Fed.R.Civ.P. 26(b)(1)

In addition, a new subparagraph (g) was added:

> Every request for discovery or response or objection thereto made by a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign the request, response, or objection and state his address. The signature of the attorney or party constitutes a certification that he has read the request, response, or objection, and that to the best of his knowledge, information, and belief formed after a reasonable inquiry it is: (1) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, giv-

violated. So has the spirit of Rule 1,[5] which declares that the purpose of the Federal Rules of Civil Procedure is "to secure the just, speedy, and inexpensive determination of every action" The discovery system depends absolutely on good faith and common sense from counsel. The courts, sorely pressed by demands to try cases promptly and to rule thoughtfully on potentially case dispositive motions, simply do not have the resources to police closely the operation of the discovery process. The whole system of Civil adjudication would be ground to a virtual halt if the courts were forced to intervene in even a modest percentage of discovery transactions. That fact should impose on counsel an acute sense of responsibility about how they handle discovery matters. They should strive to be cooperative, practical and sensible, and should turn to the courts (or take positions that force others to turn to the courts) only in extraordinary situations that implicate truly significant interests.

■ These are not simply the sentiments of an idealistic and frustrated magistrate. They are the law. They were clearly made so by the 1983 amendments to Rule 26.[6] Those amendments formally interred any argument that discovery should be a free form exercise conducted in a free for all spirit. Discovery is not now and never was free. Discovery is expensive. The drafters of the 1983 amendments to sections (b) and (g) of Rule 26 formally recognized that fact by superimposing the concept of proportionality on all behavior in the discovery arena. It is no longer sufficient, as a precondition for conducting discovery, to show that the information sought "appears rea-

sonably calculated to lead to the discovery of admissible evidence." After satisfying this threshold requirement counsel *also must* make a common sense determination, taking into account all the circumstances, that the information sought is of sufficient potential significance to justify the burden the discovery probe would impose, that the discovery tool selected is the most efficacious of the means that might be used to acquire the desired information (taking into account cost effectiveness and the nature of the information being sought), and that the timing of the probe is sensible, i.e., that there is no other juncture in the pretrial period when there would be a clearly happier balance between the benefit derived from and the burdens imposed by the particular discovery effort.

This articulation of the responsibilities counsel must assume in conducting or responding to discovery may make it appear that the 1983 amendments require counsel to conduct complex analyses each time they take action in the discovery arena. Not so. What the 1983 amendments require is, at heart, very simple: good faith and common sense. Counsel can satisfy these requirements by *not* using or responding to discovery for some ulterior purpose and by exercising straight forward judgment. The questions are simply stated: 1) what information am I really likely to need and 2) what is the most cost effective way to get it. Tailoring probes and responses to the real issues in the case at hand, rather than relying on stock questions or knee jerk objections and evasive responses, is all that is required.

---

en the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation. If a request, response, or objection is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the party making the request, response, or objection and a party shall not be obligated to take any action with respect to it until it is signed.

If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who

made the certification, the party on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

Fed.R.Civ.P. 26(g) (as amended Apr. 28, 1983, eff. Aug. 1, 1983).

**5.** Fed.R.Civ.P. 1.

**6.** *See supra* note 4.

The problem, one senses, is *not* that the requirements the law imposes are too subtle. Rather, the problem is more likely to be that counsel are less interested in satisfying the law's requirements than in seeking tactical advantages. At least in cases involving big economic stakes, good faith and common sense hardly seem to be the dominant forces. Instead, it appears that the root evil in complex civil litigation continues to be the pervasiveness of gaming. Civil litigation is too often civil only on the surface. Underneath, it is obsession with pursuit of procedural or psychological edge. In adopting the 1983 amendments, the rulemakers have unequivocally condemned that obsession.

The fact that counsel have spent so much money on this one discovery dispute raises troubling questions in this court's mind that reach beyond the confines of this particular litigation. In little more than a year this court has been forced to intervene in discovery disputes in many cases involving big economic stakes. I have emerged from my contacts with these matters with an uneasy sense that the discovery system in large commercial cases more than occasionally may be perverted into an arena for economic power plays, that parties use discovery tools (or cast their responses to discovery requests) not so much to learn what the facts are, but more to muscle one another into attitudes conducive to favorable settlements. While I do not have sufficient evidence to make a fair judgment about whether the discovery process has been so perverted in this case, my fear that discovery has been distorted by economic combat in this type of litigation compels me to make it absolutely clear that it is irresponsible, unethical, and unlawful to use discovery for the purpose of flexing economic muscle.

## I. GENERAL PRINCIPLES

Before considering specific interrogatories it is advisable to articulate some of the generalizations the court has considered *en route* to deciding matters presented by defendants' motions.

At the outset I point out that the phrase "contention interrogatory" is used imprecisely to refer to many different kinds of questions. Some people would classify as a contention interrogatory any question that asks another party to indicate *what* it contends. Some people would define contention interrogatories as embracing only questions that ask another party *whether* it makes some specified contention. Interrogatories of this kind typically would begin with the phrase "Do you contend that...." Another kind of question that some people put in the category "contention interrogatory" asks an opposing party to state all the *facts* on which it *bases* some specified contention. Yet another form of this category of interrogatory asks an opponent to state all the *evidence* on which it *bases* some specified contention. Some contention interrogatories ask the responding party to take a position, and then to explain or defend that position, with respect to *how the law applies to facts*. A variation on this theme involves interrogatories that ask parties to spell out the *legal basis* for, or theory behind, some specified contention.

It is not uncommon for a set of "contention interrogatories" to include *all* of these kinds of questions. For example, a threshold question in a sub-set of interrogatories might begin: "Do you contend that......". This question might have "subparts" which would be made applicable by an affirmative answer to the first question. Thus, if the responding party replies that it does make the contention on which the threshold question focuses, the next question it would face would be: "Specify all facts and evidence on which you base such contention." A subsequent "subpart" might ask for the legal basis for the contention.

In this section the court develops a framework for handling contention interrogatories that are served *before* substantial discovery has been completed through other means. Unless otherwise indicated, this framework will apply to all the kinds of "contention interrogatories" described here. The court does *not* intend this

framework to apply to questions in which a party asks another to identify the names of witnesses or other people with knowledge about the alleged events that give rise to the litigation. Nor do the generalizations articulated here apply to Rule 34 [7] requests for documents that bear on material factual allegations. Finally, nothing said here is intended to obstruct a litigant's decision to depose other parties and to ask them to identify the facts or evidence that support their claims or defenses.

Despite assertions to the contrary by defendants, no party has an absolute right to have answers to contention interrogatories, or to any kind of interrogatory. Rule 33(b),[8] which declares that an interrogatory is "not necessarily objectionable merely because an answer ... involves an opinion or contention that relates to fact or the application of law to fact" confers no such absolute right. The sentence of Rule 33(b) that includes the quoted passage makes it clear that it applies only to interrogatories that are "otherwise proper." After 1983, a court can determine whether any given interrogatory is "otherwise proper" only after considering, among other things, whether it is interposed for any improper purpose, and whether it is "unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation." [9] If it were clear, for example, that by using some other discovery tool a party could acquire information of comparable quality while imposing less of a burden on an opponent, a court would be constrained to rule that a contention interrogatory need not be answered, regardless of when in the pretrial period it was served.[10]

Rule 33(b) and the Advisory Committee Notes accompanying the 1970 amendments thereto clearly confer on the courts considerable discretion in deciding when (if ever) a party must answer contention interrogatories. After declaring that an otherwise proper interrogatory is not *necessarily* objectionable merely because it calls for an opinion or contention, the Rule immediately adds: "but the court may order that such an interrogatory need not be answered until after designated discovery has been completed or until a pretrial conference or other later time." [11] Commenting on this passage, the Advisory Committee notes that "Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are best resolved after much or all of the other discovery has been completed, the court is expressly authorized to defer an answer." [12]

Another passage in the Notes drafted by the 1970 Advisory Committee gives rise to the inference that the Committee anticipated that courts normally would not order responses to contention interrogatories until late in the pretrial period. Commenting on its codification of the work product doctrine in Rule 26(b)(3),[13] the Advisory Committee pointed out that under its amendments to Rule 33 "a party and his attorney or other representative may be required to disclose, *to some extent,* mental impressions, opinions, or conclusions." [14] The Committee went on to explain that "Even though a party may *ultimately* have to disclose in response to interrogatories or requests to admit, he is entitled to keep confidential *documents* containing such matters prepared for internal use." [15] Thus the Advisory Committee gave what appear to be several signals that its em-

---

7. Fed.R.Civ.P. 34.

8. Fed.R.Civ.P. 33(b).

9. Rule 26(g), *supra* note 6.

10. *See also* Rule 26(b)(2), *supra* note 4.

11. Rule 33(b).

12. Rule 33, advisory committee note to 1970 amendments.

13. Fed.R.Civ.P. 26(b)(3).

14. Rule 26(b)(3), advisory committee note to 1970 amendments.

15. *Id.,* emphasis added.

brace of contention interrogatories was something less than unqualifiedly enthusiastic: it indicated that they are "not *necessarily* objectionable", that parties or counsel "may be required to disclose, *to some extent*, mental impressions, opinions, or conclusions", and that parties "may *ultimately* have to disclose" in response to this form of discovery probe.

While these passages in the Rule and Notes probably do not go so far as to create a formal presumption in favor of not compelling responses to contention interrogatories until the end of the discovery period, they certainly invite courts to give active consideration to the wisdom of ordering such a postponement of answers to these kinds of interrogatories.

Plaintiffs in this case argue vigorously that they should not be compelled to answer any of defendants' contention interrogatories until after defendants have substantially completed the document production the plaintiffs requested earlier in the pretrial period. Citing the passages in Rule 33(b) and the Advisory Committee Notes that empower courts to postpone answers to these kinds of interrogatories, plaintiffs insist that they will not be in a position to offer full, useful answers until they have completed their study of defendants' documents.[16] Plaintiffs have offered

to answer all of defendants' subject interrogatories within 60 days after substantial completion of the document production by defendants.[17] In essence, plaintiffs argue that to compel them to answer these interrogatories early in the merits discovery phase of this class action, before they have examined defendants' documents, would be to order plaintiffs to engage in a wasteful, unproductive exercise. Counsel for plaintiffs argue that they have attempted to answer similar kinds of interrogatories at a comparable stage in other class action securities cases only to find that the information they have been able to provide does not satisfy defendants, who then press plaintiffs, near the end of the pretrial period, to answer the same interrogatories again.[18] Plaintiffs also argue that defendants have full access to information about their own behavior, and, since it is that behavior that gives rise to the plaintiffs' claims, defendants cannot be prejudiced by having to wait until completion of some discovery before having plaintiffs systematically describe the conduct of the defendants that plaintiffs contend offends legal norms.[19] In short, plaintiffs argue that because defendants know what their own behavior was and what the law requires, they have no real need for early answers to their contention interrogatories.[20] Pro-

---

16. Plaintiffs' Memorandum in Opposition to Defendants' Motions to Compel and for Sanctions, at 6 [hereinafter cited *Plaintiffs' Opposition*].

17. *Id.* at 5, 6; Plaintiffs' Discovery Statement, at 2.

18. *Plaintiffs' Opposition, supra* note 16, at 4, 9.

19. Declaration of Edward M. Gergosian in Opposition to Defendants' Motions to Compel and for Sanctions at 2 (July 26, 1985) [hereinafter cited *Gergosian Declaration*].

20. Plaintiffs also argue that defendants' contention interrogatories seek to invade interests protected by the work product doctrine. This argument, on the surface, seems to raise troublesome issues. On closer examination, however, its persuasiveness seems to evaporate. For one thing, plaintiffs have offered to respond to the interrogatories that are the subject of this dispute within 60 days after defendants substantially complete their document production. *Supra* note 17. Thus plaintiffs' counsel either must

believe that answering the questions would not involve an invasion of the work product privilege or they must be prepared to waive any rights they might have under that doctrine. The former is the more likely hypothesis. This is so because the work product doctrine, as embodied in Rule 26(b)(3), protects against disclosure, by its own terms, only "documents and tangible things." The case plaintiffs cite for a broader reading of the doctrine pre-dates by some 16 years the 1970 amendments to Rule 26 that codified, and resolved considerable inconsistent authority, in this messy subject area. *Connecticut Mut. Life Ins. Co. v. Shields,* 16 F.R.D. 5 (S.D.N.Y.1954). Moreover, even if the reasoning in *Shields* survived the subsequent amendment of the Rule, that reasoning would not offer much help to plaintiffs here. *Shields* properly read stands for the rather narrow proposition that an attorney need not describe, in response to deposition questions, the *contents of documents* that he would be protected from disclosing by the work product doctrine. *Shields* does *not* stand for the much broader

ceeding from that premise, plaintiffs go on to argue that the real purpose of the defendants interrogatories, which numbered more than 1,000 questions (counting subparts separately) as originally submitted, was to harass and pressure plaintiffs' counsel.

In support of their position plaintiffs direct the court's attention to recent treatment of contention interrogatories in two federal district courts and in the revised edition of the Manual for Complex Litigation. In February of 1985 the United States District Court for the Southern District of New York adopted a local rule (Rule 46) that presumptively prohibits use of contention interrogatories early in the discovery period and that encourages counsel not to use this form of discovery until just prior to the discovery cut-off date, i.e., after the parties have completed their substantive discovery.[21] The report of the Committee that proposed this local rule indicates that it was drafted in response to a perception that contention interrogatories that are served early in the pretrial period often generate friction between parties, contribute relatively little to the case development process, and more than occasional-ly are used to impose economic pressures on opponents, to otherwise harass them, or to delay progress toward trial.[22]

Plaintiffs also cite discussion of problems associated with interrogatories in the *Revised Report of the Special Committee On Effective Discovery in Civil Cases for the Eastern District of New York to the Honorable Jack B. Weinstein, Chief Judge.*[23] According to the lawyers and law professors who drafted the *Revised Report,* "substantive interrogatories ... often lead to objections or self-serving responses which do not advance the discovery process and which can derail the lawsuit by generating time-consuming discovery litigation. Additionally, the same or similar questions are frequently repeated at later depositions. Contention interrogatories are too often used at the outset of a litigation to harass the opposition knowing that the responses at that stage will produce little useful information."[24] The *Revised Report* goes on to suggest that "substantive or contention interrogatories [as distinguished from "identification interrogatories"] are better used, if at all, near the completion of discovery and after utilization of other dis-

proposition that the work product doctrine can be used to justify refusing to answer contention interrogatories. The Advisory Committee's Notes to the 1970 amendments remove any doubt that might otherwise attend this issue. *Supra* note 14.

The provision in Rule 33(b) making it clear that contention interrogatories are not *per se* objectionable and the provision for the work product doctrine were added simultaneously to the Federal Rules of Civil Procedure, both coming through the 1970 amendments. The same Advisory Committee that drafted the first federal codification of the work product doctrine also wrote the sentences protecting contention interrogatories from blanket condemnation. The Advisory Committee explicitly addressed the interaction between the two concepts in the following paragraph, a paragraph that makes it clear that at least as a general proposition, without some special showing, the work product doctrine cannot be used as a shield to deflect contention questions:

> Rules 33 and 36 have been revised in order to permit discovery calling for opinions, contentions, and admissions relating not only to fact but also to the application of law to fact. Under those rules, a party and his attorney or other representative may be required to disclose, to some extent, mental impressions, opinions, or conclusions. But *documents* or parts of documents containing these materials are protected against discovery by this subdivision [26(b)(3)]. Even though a party may ultimately have to disclose in response to interrogatories or requests to admit, he is entitled to keep confidential *documents* containing such matters prepared for internal use. Rule 33, advisory committee note to 1970 amendments.

21. U.S.D.C.S.D.N.Y.L.R. 46, amended Dec. 20, 1984, eff. Feb. 1, 1985.

22. Final Report of the Discovery Committee of the Southern District of New York (Fall, 1984) (unpublished report) (available from the S.D. N.Y. Court Executive's Office).

23. *United States District Court for the Eastern District of New York, Standing Orders of the Court on Effective Discovery in Civil Cases* 19 (eff. Mar. 1, 1984).

24. *Id.* at 44.

covery devices." [25] Finally, plaintiffs point to the recently revised passages of the *Manual for Complex Litigation, II*,[26] which clearly indicate that courts should be cautious in permitting the use of contention interrogatories in complex civil cases and which suggest that this discovery tool often may not be the most effective device for clarifying and narrowing issues (the *Manual* suggests that early pretrial conferences, stipulation procedures, and motions, e.g., for partial summary judgment, often accomplish the end of narrowing issues more effectively than contention interrogatories, especially in light of the limitations on the evidentiary use of interrogatory answers in multi-party cases).[27]

Thus there is considerable recent authority for the view that the wisest general policy is to defer propounding and answering contention interrogatories until near the end of the discovery period. On the other hand, even the local rule in the Southern District of New York recognizes that there may be situations in which this general policy should give way to showings, in specific factual settings, that important interests would be advanced if answers were provided early to at least some contention interrogatories.[28] In 1970, when the provision was added to Rule 33(b) making it clear that contention interrogatories were not *per se* objectionable, the Advisory Committee took the position that "requests for opinions or contentions that call for the application of law to fact ... can be most useful in narrowing and sharpening the issues, which is a major purpose of discovery." [29] In making this statement, the Advisory Committee did *not* purport to *identify* the *stage* in the pretrial period at which answers to contention interrogatories might appreciably contribute to this objective. Read in the context of its other comments about timing answers to this kind of interrogatory, however, it seems fair to infer that the Committee probably contemplated that this contribution would often best be made near the end of the discovery period. It also is clear, however, that neither the Advisory Committee nor the authors of the second edition of the *Manual for Complex Litigation* take the position that there are no circumstances in which *early* answers to contention interrogatories might significantly clarify or narrow issues. And since 1970 the judiciary has intensified its search for means to narrow the scope of disputes *early* in the pretrial period, so that parties are not constrained to spend valuable resources conducting discovery or filing motions in irrelevant or otherwise unproductive areas.[30] One basic question raised by defendants' motions is: to what extent, and in what circumstances, does it make sense to use *early* contention interrogatories (in lieu of or in addition to other tools) as a means to clarify or narrow issues?

Defendants in this case argue that there are several different ways in which compelling parties to answer contention interrogatories early in the case development period might contribute to the efficiency of dispute resolution. First, defendants argue that by helping clarify what the issues in the case are, early answers to contention interrogatories can help parties improve the focus of their discovery and can equip courts to more reliably contain discovery excesses.[31] The persuasiveness of this pos-

25. *Id.*

26. *Manual for Complex Litigation II* (Feb. 1985) (draft).

27. Id. § 21.4.6.

28. *Supra* note 21.

29. Rule 33(b), advisory committee note to 1970 amendments.

30. W. Schwarzer, *Managing Antitrust and Other Complex Litigation* (1982); Peckham, *The Feder-*

*al Judge as Case Manager: The New Role in Guiding a Case from Filing to Disposition*, 69 Calif.L.Rev. 770 (1981); Peckham, *A Judicial Response to the Costs of Litigation: Case Management, Two-Stage Discovery and Alternative Dispute Resolution*, 37 Rutgers 253 (1985); Schwarzer, *Managing Civil Litigation, The Trial Judge's Role*, 61 Judicature 400 (1978).

31. Reply in Support of Defendants' Motion for Order Compelling Answers to Interrogatories, Staying Discovery and for Sanctions, at 3, 5 (Aug. 7, 1985); Memorandum of Points and

sible justification for compelling early answers to contention interrogatories may vary with the complexity the case or the subtlety of plaintiffs' theories, as well as with the quality of the information provided in the complaint. If a complaint presents a relatively detailed specification of the real world events giving rise to it, and proceeds on relatively well established legal theories, an attempt to justify early use of contention interrogatories on the ground that answers would clarify the issues would not be especially persuasive.

Defendants further argue that in the process of crafting answers to contention interrogatories parties can be forced to systematically assess their positions earlier than they might if left to their own devices [32]—and that such early systematic assessments might persuade parties to abandon tenuous causes of action, or to dismiss opponents as to whom proof problems seem very substantial. A systematic assessment also might persuade a litigant that the *cost* of developing the evidence to support a particular claim outweighs whatever benefits might be achieved by prevailing on it. Early answers to interrogatories seeking the factual or evidentiary bases for contentions also might serve as predicates for successful motions for summary judgment on part or all of a suit.[33] Defendants argue here, for example, that compelling plaintiffs to respond early to certain interrogatories might establish a firm basis for a statute of limitations defense on one of plaintiffs' causes of action.[34] Early answers to contention interrogatories also might expose frivolous or unsupportable claims, and thus might help achieve some

of the objectives that inspired the 1983 amendments to Rule 11. This benefit might be especially significant when the mere existence of certain kinds of allegations causes significant harm, as might be the case when allegations force a party to freeze significant assets, or prevent a litigant from entering a new relationship or launching a new venture.

Because the benefits that can flow from clarifying and narrowing the issues in litigation *early* in the pretrial period are potentially significant, and because it is possible that in some circumstances answers to some kinds of contention interrogatories might contribute meaningfully toward these objectives, it would be unwise to create a rigid rule, even if applicable to only certain categories of cases, that would always protect parties from having to answer contention interrogatories until some predetermined juncture in the pretrial period.

On the other hand, there is substantial reason to believe that the *early* knee jerk filing of sets of contention interrogatories that systematically track all the allegations in an opposing party's pleadings is a serious form of discovery abuse. Such comprehensive sets of contention interrogatories can be almost mindlessly generated, can be used to impose great burdens on opponents, and can generate a great deal of counterproductive friction between parties and counsel. Moreover, at least in cases where defendants presumably have access to most of the evidence about their own behavior, it is not at all clear that forcing plaintiffs to answer these kinds of

Authorities in Support of Outside Director Defendants' Motion for Order Compelling Answers to Interrogatories and for Sanctions, at 10 (July 17, 1985); Memorandum of Points and Authorities in Support of Defendant Burroughs Corporation's Motion to Compel Responses to Interrogatories and for Sanctions, at 13 (July 22, 1985) [hereinafter cited *Defendant Burroughs' Motion*]; Reply Memorandum of Points and Authorities in Support of Defendant Burroughs Corporation's Motion to Compel Responses to Interrogatories and for Sanctions, at 5 (Aug. 7, 1985) [hereinafter cited *Defendant Burroughs' Reply*].

**32.** *Defendant Burroughs' Motion, supra* note 26, at 5.

**33.** Defendants' Motion for Order Compelling Answers to Interrogatories, Staying Discovery and for Sanctions, at 18 (July 22, 1985); *Defendant Burroughs' Motion, supra* note 26, at 5, 13; *Defendant Burroughs' Reply, supra* note 26, at 5.

**34.** Oral Argument at Hearing on Motion for Order Compelling Answers to Interrogatories, Staying Discovery and for Sanctions (Sept. 13, 1985) [hereinafter cited *Hearing*].

questions, early in the pretrial period, is sufficiently likely to be productive to justify the burden that responding can entail.

This follows in part from the court's skepticism about the *quality* of the information that *early* responses to contention interrogatories are likely to contain. Counsel drafting responses to these kinds of interrogatories early in the pretrial period may fear being boxed into a position that later embarrasses them, or that might be used to try to limit the subject areas of their subsequent discovery. Lawyers generally attempt to maximize and preserve their options while providing as little tactical help to their opponents as possible; so motivated, they are likely to search for ways to give opponents as little information as they can get away with when they respond to contention interrogatories early in the pretrial period. The "substance" of their responses to such questions might reduce to phrases like "research and investigation continuing."

In assessing the *likelihood* that *early* answers to contention interrogatories will contribute materially to the efficiency of case development one also must consider the spirit in which courts respond *early* in the pretrial period to the kinds of motions that defendants here argue might be used to reduce the scope of the suit. Early in the case development process courts generally are reluctant to rule definitively in response to motions under Rules 12(b)(6),[35] 12(c),[36] or 56.[37] Parties resisting such motions frequently can argue that it would be unfair to terminate their action without first giving them an opportunity to conduct at least some core discovery. They also can argue that pressing *early* in the pretrial period for answers to the kind of contention interrogatories that call for application of law to fact is inconsistent with the basic structure of the system for case development established by the Federal Rules of Civil Procedure. With the limited

exception of matters covered in Rule 9,[38] that system contemplates pleadings that are sufficient simply to put defendants on notice about the real world events that give rise to plaintiffs' claims. After such pleadings are filed, counsel are to use discovery tools to develop the *evidentiary* bases for the claims. Discovery initially is expected to focus on developing *evidence. After* learning what the evidence is, so the theory goes, parties will be in a position to press for stipulations, admissions, or rulings on legal issues that either dispose of the case or give it the final, focused shape it will take into trial. Thus, if a complaint is not facially deficient, early discovery should focus on generating real world data and not on examining the parties' contentions about the legal implications of that data. If a defending party believes that a claim really is facially deficient, the appropriate response, generally, is not to serve contention interrogatories, but to file a motion under Rule 12[39] or Rule 9.

Given all of the above considerations, this court believes that the wisest course is not to preclude entirely the *early* use of contention interrogatories, but to place a burden of justification on a party who seeks answers to these kinds of questions before substantial documentary or testimonial discovery has been completed. This court will look with considerable skepticism at sets of contention interrogatories, filed early in the pretrial period, that simply track all the allegations in an opponent's pleading. In this court a party who wants *early* answers to contention interrogatories must hand-craft a limited set of questions. In addition, such a party must be able to show that there is good reason to believe that answers to its well-tailored questions will contribute meaningfully to clarifying the issues in the case, narrowing the scope of the dispute, or setting up early settlement discussions, or that such answers are likely to expose a substantial

---

**35.** Fed.R.Civ.P. 12(b)(6).

**36.** Fed.R.Civ.P. 12(c).

**37.** Fed.R.Civ.P. 56.

**38.** Fed.R.Civ.P. 9.

**39.** Fed.R.Civ.P. 12.

basis for a motion under Rule 11 [40] or Rule 56. A party seeking early answers to contention interrogatories cannot meet its burden of justification by vague or speculative statements about what might happen if the interrogatories were answered. Rather, the propounding party must present specific, plausible grounds for believing that securing early answers to its contention questions will materially advance the goals of the Federal Rules of Civil Procedure. The Court will be especially vigilant in its evaluation of proffered justifications when a complaint is not facially infirm and when defendants appear to have control over or adequate access to much of the evidence relevant to their alleged misconduct.

Imposing this kind of burden should not significantly impair a party's ability to protect itself from frivolous claims or clearly overbroad discovery (i.e., discovery into subjects having no meaningful connection to claims or defenses with real potential viability). A party who feels so victimized has access, early in the pretrial period, to a number of discovery tools and other devices through which it can protect itself. It can take depositions and request documents. It can use interrogatories to compel its opponent to disclose the identities of all percipient witnesses and the location of documents and other tangible evidence, and to respond to well-focused questions about specific factual matters. For example, a defendant may use interrogatories to attempt to establish the basis for a statute of limitations defense by asking the plaintiff questions like the following: when did you purchase [the securities in question]? when did you sell them? why did you sell them? when did you first learn that the defendant was going to earn less [in a given period] than defendant had projected [at a given time or through a given document]? A party also may serve, early in the pretrial period, focused requests for admission, to the extent that they are not simply re-cast contention interrogatories.

By thoughtfully using these tools, a party normally will have ample ability to learn what evidence an opponent is relying on to support its position. If early discovery through these means reveals clear infirmities in that evidence, the party feeling victimized may turn to Rules 56 or 11 for protection. In addition, a party who honestly feels that an opponent has asserted a frivolous claim or defense can seek a protective order that could postpone its obligation to respond to some or all of that opponent's discovery. In seeking such protection, the party feeling victimized could submit competent affidavits and/or other documentary evidence that squarely contradicts the fact allegations that support its opponent's position, along with briefs showing how, under the relevant law, its opponent's position is meritless. After receiving this kind of material, this court would entertain seriously a motion asking that the party feeling victimized be relieved of its duty to respond to discovery until it had an opportunity to probe, through depositions, document requests, and other discovery tools, the nature of the evidence supporting its opponent's allegations. Of course, no such protective order would be appropriate if, after such an attack, there remained in an opponent's pleadings facially plausible allegations that were uncontradicted by competent evidence and that could support rational inferences that would make viable the opposing party's position.

■■■ The court concludes that the following procedure is appropriate with respect to contention interrogatories filed before most other discovery has been completed. The propounding party must craft specific, limited (in number) questions. The responding party must examine such questions in good faith and, where it appears that answering them would materially contribute to any of the goals discussed in this opinion, must answer the interrogatories. If answering some, but not all, of the questions would materially contribute to any of the goals described above, the responding party must answer those questions. Where the responding party feels,

---

**40.** Fed.R.Civ.P. 11.

in good faith, that providing early answers would not contribute enough to justify the effort involved, that party should telephone or write opposing counsel to explain the basis for his position. If opposing counsel continues to press for early answers, the responding party should enter objections in compliance with Local Rule 230–1 or seek permission from the Court to file an objection to the interrogatories as a group. Thereafter, the burden would fall on the propounding party to seek an order compelling answers. In seeking such an order, the propounding party would bear the burden of justification described above. To the extent, if any, that this procedure modifies the way burdens might be allocated with respect to other kinds of discovery disputes,[41] this court believes that the problems associated with the early filing of contention interrogatories, discussed above, justify the different treatment.

The sections that follow help clarify how this court will apply these general principles.

## II. APPLICATION OF PRINCIPLES TO MOTIONS AS PRESENTED

Before writing this opinion this court had not refined its reasoning about what kinds of showings it would require before compelling a litigant to answer contention interrogatories prior to substantial completion of other discovery. The moving parties, for the most part, seem not to have anticipated the kinds of requirements set forth above; their papers generally do not include the kind of information that might justify compelling plaintiffs to respond early to contention interrogatories. The court will, of course, offer the moving parties an additional opportunity to make the necessary showings. The rulings that follow are not intended to preclude defendants from

promptly filing more particularized statements of need or justification.

Because defendants, for the most part, have not offered the kinds of showings the court now requires in this setting, because this is *not* a situation in which it is clear that there is no substance to plaintiffs' claims, and because defendants have access to much of the evidence about their alleged misbehavior, the court will not enter an order that generally compels plaintiffs to answer the interrogatories that are the subject of the pending motions. Instead, plaintiffs will be required to answer only interrogatories of specified kinds. Thus the court DENIES defendants' motions to compel, without prejudice, except to the extent set forth below.

Given the amount of time the court already has committed to this litigation, and the press of other cases requiring the court's attention, it is unreasonable to expect the court to ferret out of the hundreds of interrogatories pending here those which fall in the categories to which responses now are required. Nor is there any need to use the public resource that the court represents in such a manner. After the court identifies the kinds of information plaintiffs must provide at this time, it will be incumbent on all counsel, working together, to identify the specific questions that should be answered because they fall within the court-approved categories.

### A. Interrogatories Seeking the Identity of Witnesses

■ There is no reason plaintiffs should not identify at this juncture any witnesses whom plaintiffs know have information that supports or contradicts any of the controverted allegations in plaintiffs Consolidated Amended Complaint (signed March 1, 1985). The court hereby orders

---

41. Commenting on changes in the procedures for answering and objecting to interrogatories made by the 1970 amendments to Rule 33, the Advisory Committee made the following statement:

> If objections are made, the burden is on the interrogating party to move under Rule 37(a) for a court order compelling answers, in the course of which the court will pass on the objections. The change in the burden of go-

ing forward does not alter the existing obligation of an objecting party to justify his objections. *E.g., Pressley v. Boehlke,* 33 F.R.D. 316 (W.D.N.C.1963).

Rule 33, advisory committee note.

*Pressley* did not involve contention interrogatories. That court held that a party objecting to a facially proper interrogatory bore the burden of justifying its objection. 33 F.R.D. at 318.

plaintiffs to identify such persons for defendants within thirty days of the date this order is filed.

B. *Interrogatories Seeking the Location of Documents or Other Tangible Evidence*

■ Plaintiffs contend that much of the documentary support for their allegations remains in the custody and control of the defendants. The court obviously does not expect plaintiffs to produce documents to which they currently do not have access. The court can see no good reason, however, why plaintiffs should not promptly disclose to defendants all documents in plaintiffs control that support or contradict any of the controverted allegations in their Consolidated Amended Complaint. The court also can see no good reason for dividing this kind of document production into two stages, the first consisting of responses to interrogatories that identify documents and their location, then the second consisting of the document productions themselves. Nor can the court see why plaintiffs in a case like this should be required to produce the same documents for different defendants at different times. Especially because plaintiffs have indicated [42] that they do not have a large number of relevant documents at this juncture, the most cost-effective course would be for plaintiffs to produce simultaneously for all defendants who want them (including those who have not yet filed formal document production requests) all the documents in plaintiffs' control that support or contradict any of the controverted allegations in their pending Complaint.

C. *The Allegations that Inside Director Defendants William A. Harris and Richard G. Meise Were "Control Persons"*

During oral argument defense counsel insisted that plaintiffs be compelled at this juncture to articulate how inside director defendants Richard G. Meise and William A. Harris exercised control over various reports and statements made by defendant Convergent Technologies, Inc., and to disclose all facts and identify all documents that relate in any way to the allegations that these two defendants exercised such control. Similarly, defense counsel insisted that plaintiffs be compelled now (before substantial completion of the document production by Convergent) to disclose all facts and to identify all documents that relate in any way to plaintiffs' claims that Harris and Meise were "control persons" (as that term is defined in the Securities Act of 1933) of Convergent during the class period. Michael F. Perlis, counsel for Convergent and for the inside director defendants, has submitted a Declaration (in support of his clients' motion to compel) in which he suggests that neither of these two defendants were Directors of Convergent or "signatories to the Registration Statement at issue in the Complaint." [43] Mr. Perlis argues that these two facts make it sufficiently likely that plaintiffs will not be able to prove that Harris and Meise exercised the control attributed to them to justify forcing plaintiffs to disclose now the factual bases for their contentions against these two defendants.

The question the court faces is this: assuming, for purposes of argument, that the two facts Mr. Perlis asserts are true, are they enough, in the context of the applicable law and of the allegations and disclosures already made by plaintiffs, to warrant compelling plaintiffs at this juncture to disclose their views about how Harris and Meise exercised control, as well as all the factual and documentary materials that relate to the roles these two defendants played in the events giving rise to plain-

---

42. In the Plaintiffs' Status Conference Statement (May 23, 1985), Plaintiffs indicated that at that time they could "add little to the detailed factual recitation in the complaint and the documents and testimony they have given.", at 3.

43. Declaration of Michael F. Perlis in Support of Motion to Compel and for Sanctions and Certificate of Compliance with Local Rule 230–4, at 4 (July 19, 1985) [hereinafter cited *Perlis Declaration*].

tiffs' claims? To answer this question, the court must explore several others. The first is: what information about these two defendants' roles have plaintiffs already provided? Plaintiffs' Complaint alleges that "William R. Harris joined Convergent as its Vice President, Manufacturing in February 1980" and that he became Convergent's Vice President and General Manager, Distributed Systems Division in January 1984."[44] Plaintiffs also assert that Harris worked "in various manufacturing management capacities for Hewlett-Packard Company for more than five years prior to joining Convergent Technologies."[45] Plaintiffs allege that "Richard G. Meise has been Vice President, Sales since August 1982. From January 1982 until July 1982, he was Vice President, Domestic Sales. Prior to joining convergent Technologies, defendant Meise was employed by Honeywell Corporation for more than five years, most recently as Vice President, Data Processing Operations."[46]

Plaintiffs' complaint also alleges that Harris and Meise owned and sold shares of stock in Convergent during the period in which both of these defendants allegedly knew that Convergent was experiencing serious but undisclosed problems in designing, manufacturing and selling new products.[47] Harris allegedly sold 30,000 shares of Convergent stock on November 21, 1983; Meise allegedly sold 21,000 shares in January of 1984.[48] It is not clear whether either Harris or Meise owned any additional shares in Convergent. The number of shares that plaintiffs allege each defendant sold appears to represent substantially less than 1% of the shares then outstanding in Convergent. Plaintiffs claim that after March, 1983 "there were more than 30 million Convergent Technologies common shares ... outstanding."[49]

Under applicable law, is it conceivable that officers at the levels occupied by Harris and Meise, who owned only a very small percentage of a company's stock, could be deemed "control persons" or members of a "control group?" The answer is yes. The applicable definition of "control person" focuses on power, whether exercised directly or indirectly, "to direct or cause the direction of the management and policies of a person [including a corporation], whether through the ownership of voting securities, by contract, or otherwise."[50] Ownership of a significant percentage of the voting stock of a corporation is *not* a prerequisite to a finding of control.[51] Analysis turns on whether the defendant, acting alone or as a member of an identifiable group, had the power or influence to direct significant aspects of the management of the corporation. In the words of the leading commentator in this area, former S.E.C. Commissioner A.A. Sommer, Jr., the question reduces to this: "what person or what group calls the day to day shots. The shots in major matters?"[52] Unfortunately, this crisp articulation of the target of inquiry disguises a basic ambiguity in the legal standard. As Professor Campbell has pointed out, "defining control as the power to direct management leaves a fundamental question unanswered: what quantity and quality of management function must one have in order to be deemed in control?"[53] What specific functions must be

44. Plaintiffs' Consolidated Amended Complaint for Violation of the Federal Securities Laws and Pendent State Law Claims, at 6 (Mar. 13, 1985) [hereinafter cited *Complaint*].

45. *Id.*

46. *Id.* at 7.

47. *Id.* at 38.

48. *Id.*

49. *Id.* at 14.

50. 17 C.F.R. §§ 230.405, 240.12b–2 (1985).

51. *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir.1976).

52. Sommer, *Who's "In Control"?—S.E.C.*, 21 The Business Lawyer 559, 582 (1966).

53. Campbell, *Defining Control in Secondary Distributions*, 18 Boston College Industrial and Commercial Law Review 37, 40 (1976).

controlled? [54] This ambiguity in the legal standard makes it extremely difficult to predict which person or persons will be deemed, in any given situation, to be in "control."

One thing that the cases and commentary do make clear is that the question of who is a control person, or within a control group, is a question of *fact* [55] that can be answered only on a case by case basis and only after considering a wide range of potentially relevant factors. [56] Congress intentionally included no definition of the word "control" in the Exchange Act because, according to the House Report, "[i]t would be difficult if not impossible to enumerate or to anticipate the many ways in which actual control may be exerted." [57]

One factor that court's have decided should be taken into account in resolving the "control" issue is the nature of the *position* the defendant held in the allegedly controlled corporation. As Professor Campbell notes, a person's "management position with a corporation often is emphasized as an important factor in determining control." [58] How much weight will be given to this factor in a particular case depends on all the circumstances, but, at the least, occupying a top management position creates a substantial risk that a selling shareholder will be declared a control person. There even is some authority for the view that being a high level officer makes a defendant almost by definition a control person. [59] Professor Loss has concluded more cautiously, and apparently more sensibly, that "although a person's being an officer or director does not create any *presumption* of control, it is a sort of red light." [60]

Analysis of the issue of "control" is further complicated by the availability of the elusive concept of a "controlling group." This concept can be a predicate for liability in persons who, by themselves, are not sufficiently powerful to dictate the major policy and operational decisions of a corporation but who share in the exercise of that power with a coherent group. [61] The availability of this predicate for liability complicates matters considerably, at this stage, for defendants Harris and Meise. As former Commissioner Sommer notes, when it is not clear that control is exercised by one person or by an identifiable group of shareholders, it is arguable that all "principal executive officers are *ipso facto* members of the controlling group, since they serve at the will of the board and hence it may be fairly implied they would be complaint with the will of whoever controls the board...." [62] Sommer goes on to declare that "[i]n general ... unless a person or identifiable group clearly is in control by reason of possession *and* use of voting power, all directors and policy-making officers are presumptively members of the controlling group and only compelling evidence to the contrary should remove them from the group." [63]

Moreover, job titles and responsibilities are by no means the only factors that can support the conclusion that given persons are members of a controlling group. Again the question is one of fact, taking into account a virtually unlimited number of considerations. [64] The trier of fact's inquiry will focus on whether the defendant in question is sufficiently connected, by any means, with a number of others who

**54.** *Id.* at 48.

**55.** *In Re Diasonics Sec. Litig.,* 599 F.Supp. 447, 459–460 (N.D.Cal.1984).

**56.** *Pennaluna & Co. v. Securities and Exch. Comm'n,* 410 F.2d 861, 866 (9th Cir.1969).

**57.** Marshall, *Control Person Liability,* 13 Rev. of Sec.Reg. 927, 928 n. 12 (1980), quoting House Report.

**58.** *Campbell, supra* note 52, at 44.

**59.** *Id.* at 44, 45.

**60.** 2 L. Loss, *Securities Regulation* 781 (2d ed. 1961) (emphasis in original).

**61.** *Campbell, supra* note 52, at 54.

**62.** *Sommer, supra* note 51, at 577.

**63.** *Id.* at 577 (emphasis in original).

**64.** *Id.* at 582.

are in a relevant sense "cemented"[65] together and who in fact "run the show."[66] The requisite connection can be accomplished through something as elusive as a person's persuasiveness, or the subtle powers of his or her personality. If the persons who, in combination, have the clout to determine significant directions the corporation will take in fact are appreciably influenced by a particular defendant, that defendant may be deemed a member of the controlling group.[67]

The relevance of all this to the question before this court is that defense counsel's assertions that Harris and Meise were not directors of Convergent or signatories to the 1983 Registration Statement do not show that it is clearly improbable that plaintiffs will be able to prove that these two defendants were control persons or members of the controlling group. These two defendants allegedly played major roles in the product development, marketing, and sales projection activities that are central to plaintiffs' claims. It certainly is conceivable, given their positions and alleged roles, that they would have had the influence and connections to be deemed members of a controlling group.

■ Given that possibility, it is significant that defendants have submitted no declarations containing competent testimony that Harris and Meise were members of a controlling group. Nor have defense counsel tried to show that one or more other people were in fact in control, to the exclusion of Harris and Meise. Given defendants' failure to demonstrate the facial implausability of plaintiffs allegations of control, the court would be appreciably more inclined to compel (at this stage) the discovery defendants seek if defendants submitted declarations or other competent evidence tending to refute plaintiffs' allegations that Harris and Meise are in the controlling group.

Defendants contend that the court should compel plaintiffs to respond to the contention interrogatories about Harris and Meise because if plaintiffs do not have meaningful evidence to support their control allegations "summary judgment might be appropriate as to the claim under Section 11 of the Securities Act of 1933."[68] This argument in unpersuasive, given the fact that defendants have not produced the key documents that relate to plaintiffs' claims. It seems unlikely that the kinds of plaintiffs with whom we are dealing in this case would have (at this stage) much more information than they already have presented about the roles played by defendants like Harris and Meise. How could these plaintiffs acquire such information? From what source? Plaintiffs here simply bought shares in Convergent on the open market, at arms length. Defendants have not alleged, to this court's knowledge, that these plaintiffs had special access to inside information about how Convergent was run, or by whom. Plaintiffs are forced to proceed, at the early stages, primarily, if not entirely, on the basis of public information and the structure of the defendants' situation. That structure makes it possible that the inferences plaintiffs want drawn about Harris and Meise will be drawn. Given all this, it seems likely that the most telling source of information about whether it is reasonable to pursue the theory that Harris and Meise are control persons, or members of a controlling group, are the documents controlled at this stage by defendants. In particular, the best evidence about these questions presumably is in one place: Convergent's records.

If that is true, several things would seem to follow. One is that a judge is not likely to enter a summary judgment against plaintiffs on these questions until plaintiffs have had an opportunity to examine the most likely source of relevant evidence. Nor are plaintiffs likely to be persuaded to voluntarily dismiss their claims against

---

**65.** *Id.* at 577.

**66.** *Id.* at 576.

**67.** *Id.* at 575.

**68.** *Perlis Declaration, supra* note 43, at 4.

Harris and Meise. As long as the situation makes it more than a purely speculative possibility that Harris and Meise might be deemed control persons or in a control group, and as long as plaintiffs do not have access to the documents that are likely to be most telling on these questions, it is not reasonable to expect plaintiffs to give up. It also follows that it makes little sense to force plaintiffs to respond to the contention interrogatories about Harris and Meise until plaintiffs have had an opportunity to examine the relevant documents in Convergent's files. Until then, plaintiffs presumably will not be in a position to give meaningful answers. Moreover, after such an examination, defense counsel and the court could much more reasonably press plaintiffs to fish or cut bait on the control allegations against these non-director defendants.

The court's conviction that this is a sensible solution to the problem presented by defendants' motion is reinforced by the fact that it is not clear that forcing defendants to wait for responses to contention interrogatories until 60 days after Convergent has produced its documents will adversely affect, in a material way, any competing interests of the defendants. It is clear that the case will proceed against Convergent itself. It is equally clear that Convergent will have to produce its relevant, unprivileged documents. The expense of that production will be incurred, even if plaintiffs are forced to respond to the contention interrogatories immediately. Defense counsel have not argued that failure to secure answers to the interrogatories at this time will save Harris and Meise any money, or enable them to avoid any other burdens. If plaintiffs press for depositions of Harris or Meise, or seek to invade other interests of theirs prior to substantial completion of Convergent's document production, defense counsel may approach this court for a protective order.

The one specific interest of defendants Harris and Meise that counsel argued would be invaded by failure to secure prompt answers to the contention interrogatories is their interest in clearing their names of allegations of criminal conduct.[69] Defense counsel point out that paragraph 11 of the Consolidated Amended Complaint accuses Harris and Meise, as well as the other named defendants, of conduct that would constitute, if proved beyond a reasonable doubt, a crime.[70] Understandably, defendants are anxious to inter those allegations. It is not at all clear, however, that they would be able to achieve that end if the court ordered plaintiffs to answer their contention interrogatories at this time. For the reasons discussed above, even if plaintiffs have little evidentiary support at this juncture for these accusations, a court is not likely to enter a judgment removing them from the case until plaintiffs have had a chance to examine the most likely source of evidence on this matter: Convergent's documents. It follows that granting the defendants the relief they seek here (prompt answers to their interrogatories) is simply too unlikely to achieve their goal to justify imposing on their opponents what would apparently be a substantial and unproductive burden.

Thus, after careful consideration, the court concludes that defendants have failed to make a showing sufficient to justify an order compelling plaintiffs, at this time, to answer the contention interrogatories as they relate to allegations of control by defendants Harris and Meise. The court denies defendants' motion in this respect, but orders plaintiffs to answer the questions relevant to these two defendants within 60 days after substantial completion of the document production by Convergent.

### D. Defendant Burroughs Contention Interrogatories

Defendant Burroughs Corporation has filed a set of 15 interrogatories which, counting subparts, add up to at least 52 questions, many of which are compound and expansive, in part because the allegations against Burroughs in plaintiffs' Com-

---

**69.** *Hearing, supra* note 34.

**70.** *Id.; Complaint, supra* note 43, at 12 13.

plaint are more than occasionally compound and expansive. Burroughs apparently cannot decide how to characterize these interrogatories. In its opening memorandum, Burroughs refers to these questions as "a set of fifteen Rule 11 interrogatories."[71] In its reply memorandum, however, Burroughs insists that its motion "is not a Rule 11 motion. Burroughs seeks discovery and sanctions under the applicable discovery rules. Rule 11 merely buttresses this discovery request. Burroughs will subsequently determine whether a motion under Rule 11 or otherwise is appropriate."[72]

▮ Burroughs says that its "interrogatories track the specific allegations relating to Burroughs and request plaintiffs to state the factual basis for those allegations."[73] That sounds like a classic characterization of contention interrogatories. Burroughs *also* insists, more expansively, that it is entitled to learn, through interrogatories propounded at this stage, the identity of the persons and documents relevant to each allegation *and* the scope of the plaintiffs' investigation into the factual basis for each allegation. The latter inquiry, focusing on the nature of the homework plaintiffs and their counsel did before filing the complaint, would be appropriate not under normal discovery rules, but only under rule 11. It seems to this court that it would be unwise and unwarranted to permit Rule 11 discovery (i.e., discovery into the quality and scope of the investigation that preceeded the filing of a claim) until after the party seeking the Rule 11 discovery has shown, through traditional discovery, that there is more than a speculative basis for believing that its opponent may have violated the norms set forth in Rule 11. The interests potentially invaded by Rule 11 interrogatories are considerable; a party seeking to invade those interests should be required to present a sub-

stantial justification. Burroughs has not presented a sufficient justification for any Rule 11 interrogatories it may wish to press at this juncture, so the court hereby denies Burroughs' motion to compel insofar as it embraces genuine Rule 11 inquiries. This denial, of course, in no sense prejudices any right Burroughs might later acquire to conduct inquiry into Rule 11 subjects.

Burroughs currently has pending before the District Judge to whom this case is assigned for trial a motion to dismiss and for judgment on the pleadings. That motion presses the court to decide whether, as Burroughs contends, plaintiffs allegations against Burroughs are facially so deficient that the suit against Burroughs must be terminated at this juncture, before defendants have disclosed the relevant documentary evidence which plaintiffs some months ago requested. Burroughs concedes, in the context of that motion, that it was a substantial customer of defendant Convergent. Plaintiffs allege, in their Consolidated Amended Complaint, that Burroughs was Convergent's "major customer, accounting for 46% and 48% all of its revenues in 1982 and 1983, respectively." Burroughs also concedes that one of the eight members of Convergent's Board was a Burroughs designee (defendant Jacobson, who was also vice chairman and a director of Burroughs). Finally, Burroughs concedes that it owned warrants to purchase some 750,000 shares of Convergent stock (about 2.5% of Convergent's outstanding shares). Burroughs contends that it never exercised those warrants, but instead, sold them to the underwriters.[74]

Conceding this much, Burroughs presses the District Court to enter judgment on the pleadings on its behalf, holding, among other things, that these facts are insufficient,

---

**71.** *Defendant Burroughs' Motion, supra* note 26, at 7.

**72.** *Defendant Burroughs' Reply, supra* note 27, at 7. *See also* Burroughs' waffling on this issue, *id.* at 8.

**73.** *Defendant Burroughs' Motion, supra* note 26, at 7.

**74.** Memorandum of Points and Authorities in Support of Defendant Burroughs Corporation's Motion to Dismiss and for Judgment on the Pleadings, at 1, 5, 6, 12 (July 22, 1985).

as a matter of law, to establish controlling person liability in Burroughs.[75] If the District Court grants Burroughs motion, the discovery questions before the undersigned will vanish. If the District Court denies Burroughs' motion, I assume Burroughs will continue to press for answers to its contention interrogatories. Without presuming anything about how the District Court will rule, I will respond to the merits of the motion Burroughs has presented here so that if the questions it raises remain real, they will be answered.

Much of what the court has written, above, in response to issues raised by defendants Harris and Meise, applies here. In its motion for judgment on the pleadings, Burroughs insists that "[n]o authority exists for plaintiffs' bald assertion that control can be established because of Burroughs' relationship to Convergent as a customer."[76] This simply is not accurate. As former Commissioner Sommer has pointed out, "[p]ersons other than shareholders, record or beneficial, or management may often have the power to control effectively a corporation's affairs. For instance, a creditors' committee ... may be in control.... Similarly, a substantial customer may be of such consequence to the prosperity of the corporation that in fact it has the power to dictate the policies of the corporation."[77] Sommer also points out that "historical, traditional, or contractual associations" have been viewed as factors tending to support a finding of control.[78] In addition, he notes that a person may acquire control through a "relationship to key customers."[79] There also have been instances in which an individual's business relationships have played a significant role in deciding the control issue. As Professor Campbell points out, for example, the court

in *S.E.C. v. North American Research & Development Corp.* "relied upon an individual's status as a 'business advisor' to the company's majority shareholder as an important basis to support its finding of the existence of control."[80] Finally, Campbell also reports that "a network of business relationships can lead to a determination that a control group exists."[81]

■ These observations, in the context of the established rule that the issue of control is an issue of fact that must be determined after case-specific analysis of a host of variables, leads me to conclude that it is conceivable that plaintiffs could prove, after discovery from defendants, that Burroughs was a control person or in a group that controlled Convergent during the relevant time period. Having reached that conclusion, the reasoning I articulated in the section dealing with defendants Harris and Meise is triggered and dispositive of Burroughs' motion to compel at this juncture. The information needed to test the plaintiffs' and Burroughs' competing views about the control issue, as well as the aider and abbetor issue, is most likely to be found in the documents that Convergent is in the process of producing for plaintiffs. The court fails to see how substantial interests of Burroughs will be harmed it if is forced to wait until no more than 60 days after completion of that document production for answers to its interrogatories. If, prior to the time plaintiffs are required by this order to respond to Burroughs' contention interrogatories, plaintiffs seek to obtain additional discovery from Burroughs, and thus to impose costs on Burroughs that it feels it cannot be fairly asked to incur, Burroughs may approach the court for a protective order.

**75.** *Id.* at 3.

**76.** *Id.* at 10, n. 18.

**77.** *Sommer, supra* note 51, at 573 (citing *Walston & Co.,* 7 S.E.C. 937 (1940), and *S.T. Jackson & Co., Inc.* 48–52, CCH Dec. para. 76,068 (1950)).

**78.** *Id.* at 575.

**79.** *Id.* at 581.

**80.** *Campbell, supra* note 52, at 47.

**81.** *Id.* at 56.

E. *Other Purported Justifications for Compelling Answers To Contention Interrogatories Prior to Substantial Completion of Document Productions by Defendants*

Defendants have suggested several other possible justifications for compelling plaintiffs to answer their contention interrogatories prior to substantial completion of the document productions by defendants. Not having anticipated the structure this court would impose on analysis of these issues, defendants presented only conclusory arguments in support of these justifications. The court finds none of these persuasive at this time, but does not preclude defendants from making more detailed submissions. The court alludes here, in particular, to the defendants' arguments that prompt answers to their contention interrogatories might expose grounds for a statute of limitations defense to the Section 11 claims, or might establish a basis for striking from the case the plaintiffs' allegations that Convergent's accounting treatment of certain warrants was unlawful.[82] To put the matter simply, defendants have failed to show, by carefully developing the applicable law, and by applying that law to the facts as alleged by plaintiffs or as supported in competent declarations or documentary evidence from defendants, that there is a real likelihood that *early* answers from plaintiffs to questions in these areas will result in a significant re-shaping of the litigation or a significant savings to one or more of the defendants. The court has done some research in the relevant areas of law, but has not been able to satisfy itself that forcing plaintiffs to answer contention interrogatories in these areas at this time, prior to substantial completion of the defendants' document production, would serve appreciably any of the interests protected by the Federal Rules of Civil Procedure. If *early* answers would advance any such interests, it is up to defendants to show the court how.

Defendants also argued at the hearing on these motions that early answers to their contention interrogatories would materially help their economic experts develop their analysis of the plaintiffs' fraud on the market theory. Defendants argued generally that answers to their interrogatories would help them ascertain what information was in the market at what junctures, and that it takes experts a great deal of time to conduct the kind of examination of the fraud on the market theory that is necessary either to set the stage for serious settlement negotiations or to conduct final preparations for trial. This court's review of the relevant law[83] suggests that the kind of information defendants appear to be seeking is most likely to be useful, if at all, in connection with affirmative defenses that might be available in response to the fraud on the market theory. But it is not clear why defendants should be permitted to press plaintiffs, *early* in the discovery period, *through this problematic type of interrogatory,* for help developing affirmative defenses. It is not clear how defendants would be substantially better off if they had answers to these questions now instead of within 60 days after substantially completing their document production. Defendants already have taken many of the plaintiffs' depositions. Thus defendants already have access to information about the bases on which many of the plaintiffs made their decisions to buy and sell, and about whether plaintiffs would have made their purchases even if they had known about the alleged material misrepresentations and omissions in Convergent's communications to the public. The other principal bases on which defendants might try to avoid liability under the fraud on the market theory appear to turn on whether an insufficient number of traders relied on Convergent's misstatements or omissions to inflate the price or whether those misstatements were not made in forms or forums that received wide enough attention

---

**82.** *Supra* note 34.

**83.** *Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975); Goldwasser & Wasserman, *Fraud on the Market,* 16 Rev.Sec.Reg. 949.

349

to affect the price of the securities.[84] It is not obvious why plaintiffs would have better access than defendants to evidence about how the information Convergent made public got into the market place. Convergent presumably knows what information it published and through which channels. Convergent thus would seem to be in a better position than plaintiffs to begin examining how, and to what extent, that information penetrated the marketplace. Plaintiffs, we must recall, are individuals who purchased shares of Convergent stock during a specified time period. They have been deposed and have answered questions about the information to which they had access. Thus it appears that the real target of defendants' interrogatories in this subject area, as in others, is the information that has been developed by plaintiffs' counsel. Why, one is constrained to ask, are plaintiffs' lawyers in any better position than defendants' lawyers to develop data about how far into the marketplace defendants' communications had penetrated? And since this kind of information seems relevant largely, if not entirely, to affirmative defenses, the court is concerned that forcing plaintiffs' counsel, early in the pretrial period, to disgorge any material they might have developed on these questions might implicate interests that the work product doctrine was designed to protect. The court recognizes, of course, that Rule 26(b)(3), in terms, protects only documents and tangible things; but *Hickman v. Taylor*[85] and its progeny were concerned in large measure about protecting counsels' incentives to do their own investigative homework and research, and ordering plaintiffs *early* in this action to disclose whatever information they might have developed in these subject areas might damage those incentives. For all of the reasons discussed above, the court denies, without prejudice, defendants' motion to compel answers to interrogatories relating to the fraud on the market theory.

In sum, the court denies defendants' motions to compel except to the limited extents set forth above. The court orders plaintiffs to provide the information about witnesses and to produce the documents described in sections II. A. and II. B., above, within thirty days of the filing of this Order. The court further orders plaintiffs to answer the remaining contention interrogatories that are the subjects of these motions within 60 days after substantial completion of the document production initiated by plaintiffs First Consolidated Request for Production of documents, dated March 13, 1985.

---

**84.** *Goldwasser & Wasserman, id.,* at 953, 954.

**85.** 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).