**McCORMICK–MORGAN, INC., a California corporation, Plaintiff,**

v.

**TELEDYNE INDUSTRIES, INC., a California corporation, Defendant.**

**No. C–89–4338 SC (WDB).**

United States District Court, N.D. California.

Feb. 11, 1991.

Thomas Smegal and Theodore Brown, III of Townsend and Townsend, San Francisco, for plaintiff.

Fred Lorig, Los Angeles, and Gene Tabachnick, Santa Monica, of Bright and Lorig, Los Angeles, for defendant.

## ORDER AND OPINION RE DISCOVERY

WAYNE D. BRAZIL, United States Magistrate Judge.

Having considered the parties' written and oral submissions regarding defendant/counterclaimant, TELEDYNE INDUSTRIES, INC.'s ("Teledyne") Motion to Compel Discovery, and plaintiff, counterdefendant McCORMICK–MORGAN, INC.'s ("MMI") motion for a protective order, the court hereby enters the following opinion and ORDER.

### I. Introduction And Background

The disputes addressed here involve the scope of waiver of the attorney-client privilege and issues related to depositions noticed under F.R.Civ.P. 30(b)(6). On December 18th, 1990, the court ordered the parties to submit supplemental briefs regarding several issues. The following is apparent from those and other submissions.

On December 18, 1989, counsel for plaintiff, McCormick–Morgan, Inc. (MMI) wrote to the president of Teledyne that "we [counsel for MMI] have advised our client that, in our opinion, the '977 patent is invalid...." Counsel for MMI then proceeded to set forth some of the bases for that opinion of invalidity. On April 16, 1990, counsel for MMI informed American Airlines (not a party to this action) by letter that, "[i]t is our view, previously conveyed in writing to our client (and to Teledyne), that the '977 patent is invalid for any one of a number of reasons...." The letter then summarized those reasons. On September 25, 1990, counsel for MMI informed counsel for Teledyne by letter that;

McCormick–Morgan ... will assert ... in defense of Teledyne's charges of willful

infringement reliance on the advice of counsel.

McCormick–Morgan ... will accordingly waive the attorney-client privilege as to the subject-matter of the advice given ... or communicated to ... them by any attorney regarding the validity, enforceability, and/or infringement of the patent-in-suit, up to the date of the letter from Townsend and Townsend to American Airlines. [April 16, 1990].

On October 17, 1990, MMI responded to Teledyne's second request for production of documents by, among other things, restating that it was invoking the advice of counsel defense to Teledyne's allegation of willful infringement and was waiving the attorney-client privilege:

1) as to all documents on which it will rely in defense of Teledyne's charges of willful infringement, which documents are all dated or were all communicated to plaintiff prior to about mid-April, 1990, and 2) as to all documents, otherwise privileged, that are dated prior to about mid-April 1990 and that constitute communications with, or the basis of communications with, the client on the subjects of the validity and enforceability of the patent in suit or whether any activities or products of plaintiff infringe any valid claim of the patent in suit.

Pursuant to this waiver, MMI thereafter voluntarily produced a November 30, 1989, letter from counsel for MMI to William J. Sewalk, President of MMI, and two file memoranda dated November 6, 1989, prepared by MMI's counsel. These documents reflect advice given by counsel to MMI regarding infringement, validity, and enforceability of the patent-in-suit. The November 6, 1989, memorandum also includes a very brief reference to how damages are calculated.

On October 26, 1990, in response to Teledyne's October 8, 1990, 30(b)(6) deposition notice, MMI designated Messrs. Lombardi and Cunningham to testify on behalf of MMI. It appears that MMI also contemplated that James McCormick and, perhaps, Patrick G. O'Brien would respond to some of the matters covered in Teledyne's 30(b)(6) notice. During the subsequent depositions of Mr. McCormick and Mr. Lombardi, on October 30 and 31, 1990, respectively, counsel for MMI invoked the attorney-client privilege as grounds for instructing the witnesses not to answer certain questions.

## II. The Parties' Arguments

Teledyne contends in its November 30, 1990, motion that by asserting the "advice of counsel" defense, MMI has explicitly and unconditionally waived the attorney/client privilege as to communications between counsel and MMI with respect to infringement, validity and enforceability of the patent-in-suit. Teledyne also contends that, independent of the explicit waiver in connection with the advice of counsel defense, counsel for MMI waived MMI's attorney-client privilege by sending the letters adverted to above to Teledyne and to American Airlines. In addition, Teledyne argues that because otherwise privileged documents that MMI disclosed pursuant to its decision to invoke the advice of counsel defense included references to damages and to litigation strategy, MMI also has waived its privilege with respect to communications between it and its counsel on those subjects. Finally, Teledyne contends that MMI has violated F.R.Civ.P. 30(b)(6) by producing witnesses who were not in fact prepared to answer deposition questions in the subject areas covered by the 30(b)(6) notice.

In its December 7, 1990, brief, MMI initially admitted that it waived the attorney/client privilege by asserting the "advice of counsel" defense. It argued, however, that the waiver did not cover all affirmative defenses, but extended only to substantive advice regarding infringement, validity and enforceability that was communicated prior to early April of 1990.

For reasons we fail to comprehend, in its December 24, 1990, supplemental brief, MMI seems to reverse itself by contending that it has not actually waived the attorney/client privilege. It argues that, counsel's statements aside, the privilege is only waived if the documents actually produced

were privileged. MMI argues that all documents produced thus far, i.e., the November 30, 1989, opinion letter from Mr. Smegal to MMI, the October 17, 1989, opinion letter from Mr. Hann to MMI, the April 20, 1990, letter from Mr. Smegal to American Airlines, and the December 18, 1989, letter from Mr. Smegal to Teledyne, are not privileged. Therefor, according to MMI, the privilege has not been waived. MMI also argues, apparently in the alternative, that any waiver of the attorney/client privilege that the court might find occurred must be limited in scope and time. It argues that Mr. Smegal's November 30, 1989, opinion letter addressed only two of several possible bases for invalidity. Therefor, MMI argues, if any waiver has occurred, it is only as to communications regarding those two particular bases for invalidity. In addition, MMI asserts that the "advice of counsel" defense turns on the state of mind of the accused infringer only at or soon after there is actual notice of possible patent infringement; it follows, according to MMI, that it has waived the privilege only as to communications at or soon after it first learned of the Teledyne patent. Thus counsel for MMI contends that most of the instructions not to answer given to MMI witnesses during their depositions were justified.

With respect to the F.R.C.P. 30(b)(6) issues, MMI contends that the deposition notices were premature because fact discovery was not completed at that time. Further, MMI argues that the broad phrasing of Teledyne's questioning in effect required the deponents to set forth MMI's contentions. MMI argues that, in a case like this, depositions are an inappropriate (because unreliable and potentially prejudicial) discovery vehicle for learning the bases of an opponent's contentions and that such discovery should be undertaken, if at all, through properly framed contention interrogatories served after other fact (and, perhaps, expert) discovery has been completed.

III. Attorney/Client Privilege

A. *Waiver*

■ Townsend & Townsend explicitly and unequivocally waived MMI's privilege with respect to communications in specified subject areas through the September 25, 1990, letter to Bright & Lorig and in the written response of October 17, 1990 to Teledyne's request for production of documents (see quotations from these documents, above). These waivers could not be clearer. They are completely sufficient predicates, standing alone, for a finding that all communications through April 16, 1990, between MMI and counsel on these subjects must be disclosed. And even though the Townsend firm appears regularly in this court, and is known for its quality work, we cannot begin to understand how its lawyers could argue otherwise. It certainly is not true that whether there was a waiver depends on whether documents disclosed in response to the request for production, or otherwise, in fact included otherwise privileged communications.

Nor do we understand how the Townsend lawyers could contend that the documents that they in fact disclosed pursuant to the invocation of the advice of counsel defense did not include otherwise privileged communications. Those documents included the November 30, 1989, letter from Mr. Smegal to the President of MMI. This letter was on Townsend & Townsend stationary, signed by Mr. Smegal, and obviously written by Mr. Smegal in his capacity as counsel to MMI. In this letter Mr. Smegal clearly is giving legal advice. He gives it only to his client (there is no indication on the document, or from any other source, that copies were sent to anyone else). There is no indication in the letter that the analysis it contains is to be passed along to anyone else or used for any purpose other than privately forming a judgment about what course of action the client should take. The word "confidential" is stamped on each page of the letter (we do not know when this word was stamped on this document), and earlier in the pretrial period Townsend & Townsend included it in the log of documents it insisted were privileged and thus not discoverable. Thus there are many reasons for us to infer that the com-

munication was intended to be confidential and no reasons for us to infer otherwise. In this setting, we cannot understand how counsel for MMI could plausibly argue that in voluntarily disclosing this document they were not disclosing an otherwise privileged attorney-client communication.

Counsel for MMI also voluntarily disclosed to Teledyne a memorandum written by Mr. Smegal on November 6, 1989. This apparently confidential memorandum contains descriptions or accounts of several communications between Mr. Smegal and MMI personnel. These communications relate to the securing of legal advice, or consist of the giving of legal advice, and appear to have been intended to be confidential. There is no reason to believe they were shared with non-parties or intended to be. Thus, by disclosing this memorandum, counsel for MMI has disclosed what would otherwise be privileged communications with their client.

MMI cites *American Standard Inc. v. Pfizer Inc.*, 828 F.2d 734 (Fed.Cir.1987) in support of its assertion that the communications it has in fact disclosed were not privileged, and thus that producing them did not waive the attorney/client privilege. In *Pfizer* the court held that a disclosed opinion letter did not waive the privilege:

> The 'opinion letter' is not signed, is not addressed to [the client] or anyone else, and bears no letterhead or other indication of source. It discusses no prior action of [the client] and recommends no action to be taken by [the client], but merely concludes that the '123 patent is invalid.

*Id.* at 745.

In all legally significant respects, the facts before us are thoroughly distinguishable from those in *Pfizer*. The November 30, 1989, letter from Mr. Smegal to Mr. Sewalk of MMI is written on Townsend & Townsend letterhead, is addressed specifically to Mr. Sewalk from Mr. Smegal, is marked "confidential", and communicates counsel's confidential opinions regarding the infringement, invalidity, and unenforceability of the " '977 patent". Thus, it is clearly a confidential attorney/client com-

munication. Similarly, as we stated above, the November 6, 1989, internal memorandum reflects confidential attorney/client communications (summarizing discussions concerning infringement of the '977 patent). Why *Pfizer* has anything to do with the issues presented to us remains a mystery, the answer to which must be known only to counsel for MMI.

■ It follows that even if something more than the express, unconditional waivers reflected in the letter of September 25, 1990 and in the October 17, 1990 response to Teledyne's request for production were necessary (nothing more is necessary) to effect a waiver, the voluntary disclosure of the two documents just described certainly would constitute an independently sufficient basis for our holding that a waiver has been made. Voluntary disclosure of a privileged attorney/client communication constitutes a waiver of the attorney/client privilege as to all communications on the same subject matter. *Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18, 24 (9th Cir.1981). Thus, the only real issues facing us with respect to the waiver relate to its scope, which, in this case, has two dimensions: breadth of subject matter and period of time. As the discussion in the ensuing paragraphs will make clear, we have concluded that the kinds of communications and documents that MMI must disclose vary with the time period in question. Basing our reasoning in part on the nature of commitments voluntarily made by MMI (through its counsel), and in part on the nature of the duties imposed on MMI by the substantive law under which the issue of willfulness will be litigated in this case, we have concluded that the duty of disclosure is much broader for the period through April 16, 1990, than for the period from April 17, 1990 until the trial of this matter. April 16, 1990 demarcates the boundary between the two periods in part because MMI chose to waive the attorney-client privilege with respect to communications on certain subjects through that date, and in part because in our view, by that date MMI had completed its initial determination (responsive to the

duty clearly imposed on it by substantive patent law) about whether it could continue to sell its products without violating rights held by Teledyne under the patent in issue. Thus, in the sections that follow, we make one judgment about the scope of the disclosure obligation through April 16, 1990, and a second, different judgment about the scope of that obligation for the period thereafter.

### B. Scope of the Waiver through April 16, 1990.

There are two levels at which we must conduct our inquiry into the scope of the waiver for the period through April 16, 1990. In the first, we focus on the commitments and decisions voluntarily made by counsel for MMI with respect to the subject matter scope of its client's waiver. In the second we consider whether there are any other bases, in the record before us, for finding a waiver that extends to even broader subject areas.

■ Focusing first on the scope of the waiver effected by the decisions and commitments made by counsel for MMI, we turn to Mr. Brown's letter of September 25, 1990 and MMI's response of October 17, 1990 to Teledyne's second request for production of documents. Between these two writings, MMI waived its privilege with respect to all otherwise privileged communications between counsel and MMI that relate in any way to "the validity, enforceability, and/or infringement of the patent in suit...." (Brown letter of September 25, 1990). In addition, MMI voluntarily agreed to disclose "[a]ll documents *relating or referring to,* constituting, *or supporting* such advice ..." (*Id.;* emphasis added). Restating essentially the same commitment in its subsequent response to Teledyne's second request for production of documents, MMI committed itself to disclose, among other things, "all documents ... that constitute communications with, *or the basis of communications with,* the client on the subjects of [validity, enforceability, or infringement]." (emphasis added). This commitment obviously reaches documents that otherwise might be protected by the work product doctrine; such documents must be disclosed, pursuant to this commitment, even if their contents were not "communicated" to the client and even if they do not record or allude directly to communications that actually were made to the client.

■ Counsel for MMI has chosen to articulate its voluntary waiver in terms of communications from counsel to client. However, MMI has voluntarily interjected the advice of counsel defense into this case. By invoking that defense, MMI has placed *its* state of mind in issue. To explore that state of mind, it is not sufficient to examine only communications coming into it. In addition, it is necessary to explore how MMI reacted to those communications, what it thought of and about them, what information and thoughts MMI might have generated (on issues related to willfulness) on its own, or from sources other than counsel, and what communications MMI made to its counsel. Thus, we must order full disclosure not only of communications from counsel to client (plus related or supporting documents), but also of the client's reactions, information, and thoughts on the relevant subjects (which include validity, enforceability, and infringement). To be clear, what is discoverable from MMI reaches beyond what MMI actually communicated on these subjects to its counsel; it also reaches views and information on validity, enforceability, and/or infringement that were privately held by MMI (i.e., even those not shared with the lawyers).

■ Apparently as some kind of fallback position, MMI has argued that the subject matter scope of its waiver reaches only those specific potential bases for challenging validity or enforceability that are the subjects of communications it already has disclosed (relating primarily to prior art and pre-filing sales activity). We hold that this argument is inconsistent with both the relevant case law and with MMI's own voluntarily made commitments in this case. The law is clear: MMI cannot waive the attorney-client privilege as to certain communications regarding infringement, validity, and enforceability, but not others.

See e.g. *Handgards, Inc. v. Ethicon, Inc.*, 413 F.Supp. 926, 929 (N.D.Cal.1976), aff'd 601 F.2d 986. Moreover, we see no reason not to require counsel for MMI to honor the commitments they voluntarily made in this matter, especially when those commitments are consistent with our view of what the law would require anyway.

At this juncture we turn to Teledyne's argument that the subject matter scope of the waiver by MMI is even broader than described above. Teledyne may be advancing several different positions here. The most radical would be that MMI has waived its privilege, and its counsel has waived work product protection, for all otherwise privileged or protected communications or documents that have any relevance to this case. There is no basis for finding such a broad waiver. As comments that follow make clear, nothing done, voluntarily or inadvertently, by MMI or its counsel could support any such finding.

A second, somewhat less radical position would be that MMI has waived its privilege, and its counsel has waived protection under the work product doctrine, for all documents or communications that relate in any way to *any* affirmative defense which MMI has pled or or on which it might rely at trial. We also reject this argument (we are not positive Teledyne is, in fact, even taking this position). As far as we are aware, the only disclosures to which Teledyne might point to support such an argument are the letters by counsel for MMI to the president of Teledyne (A.E. Dotson) on December 18, 1989, and to counsel for American Airlines on April 16, 1990. As noted above, these letters purport to set forth opinions of counsel previously communicated (presumably in confidence) to MMI. But the opinions thus shared relate *only to issues of validity and enforceability*, subjects covered by the subsequent voluntary waiver of privilege by MMI in connection with its invocation of the advice of counsel defense. Thus, even if the sending of these letters constituted an independent predicate for a finding of waiver (an issue we need not resolve), the subject matter scope of the communications and documents consequently subject to discovery

certainly would be no broader than the matter made discoverable by MMI's subsequent invocation of the advice of counsel defense and its voluntary waivers, as described in preceding paragraphs.

The contrary argument, which we reject, apparently would run like this: MMI disclosed in these letters (and in subsequent document productions and depositions) matters related to how it would defend against a suit brought by Teledyne, so the "subject matter" of the waiver is "the defense of the lawsuit." This reading of the concept of "subject matter" is far too broad for this context, where case law clearly compels courts to err on the narrow rather than the broad side, out of deference to the values that underlie the attorney-client privilege. See e.g. *Hercules Inc. v. Exxon Corp.*, 434 F.Supp. 136, 156 (D.Del.1977). We hold that the "subject matter" as to which waiver has occurred, through the voluntary decision by MMI and its counsel to invoke the advice of counsel defense, as well as through the earlier letters, reaches all issues related to validity, enforceability, and infringement, but not any other theoretically independent potential bases for defending the case.

Teledyne also has argued that MMI has waived its privilege, and that its counsel has waived the protection of the work product doctrine, with respect generally to the subject of litigation "strategy." Again, we believe that Teledyne is attempting to give the concept of "subject matter" far too broad a sweep. Teledyne argues, not vapidly, that Mr. Smegal's November 6, 1989 memorandum (voluntarily produced by MMI) includes discussions of matters arguably characterizable as "strategy." Certainly there is some discussion in one of the memoranda about ways to change MMI's product so that it would be even less vulnerable to an allegation of infringement. But what makes this kind of communication discoverable in this case is the fact that it relates to the subject of infringement, on which MMI voluntarily and explicitly has waived the protection it might otherwise enjoy, *not* that it also arguably has a "strategic" dimension. The word "strat-

egy" is hardly self-defining; as such, it has a potentially huge reach, into virtually every aspect of a party's or lawyer's approach to a case. In other words, virtually everything a lawyer or client does or thinks in relation to a given case might be "related to" (as lawyers so expansively use that phrase) their litigation strategy. So, if we permit the fact that disclosure has been made of one communication that might have some connection with litigation strategy to serve as a predicate for a holding that there has been a waiver with respect to all communications that relate to litigation strategy, we would be completely eviscerating the concept of "subject matter" waiver and offending the law's mandate to construe the scope of a waiver narrowly. This we decline to do. Thus, the fact, by itself, that a document or communication relates to litigation "strategy" will not serve as a sufficient basis for compelling its disclosure.

■ Finally, Teledyne contends that MMI's waiver reaches all communications and documents on the subject of damages. The sole basis for this argument, as we understand it, is the inclusion of one paragraph in one of the documents disclosed by counsel for MMI pursuant to the decision to invoke the advice of counsel defense. The one paragraph in question appears in Mr. Smegal's November 6, 1989, memorandum. There counsel for MMI discloses presumably private conversations with MMI personnel which, the context shows, focused primarily on whether MMI might have a viable defense based on sales of products more than a year before Teledyne first filed its patent application. In that context, counsel for MMI responded to a question that appeared to blur concepts of validity/enforceability with concepts of damages. That answer, as disclosed in the Smegal memorandum, consisted of the following:

> I explained that irrespective of when the installation was made, assuming it was not more than a year before the filing date of the original application, that the patent laws allowed the patentee to exclude others from making, using or selling for the 17 year patent monopoly even

though activities may have commenced prior to the patent issue date of June 6, 1989. Damates [sic] are measured however only from the issue date.

The question we face is whether disclosure of this one question and answer is a sufficient basis for holding that MMI has waived its privilege with respect to all otherwise privileged communications that relate to the damages aspect of this case. We hold that it does not. In *Hercules Inc. v. Exxon Corp.*, 434 F.Supp. 136 (D.Del. 1977) another patent infringement case, the court pointed out that the principal criterion courts should use in deciding issues about waiver of the attorney-client privilege is fairness:

> The privilege ... has been found to be waived only if facts relevant to a particular, narrow subject matter have been disclosed in circumstances in which it would be unfair to deny another party an opportunity to discover other relevant facts with respect to that subject matter.

*Id.*, at 156. Having considered counsels' arguments, we are not persuaded that declining to order disclosure of all otherwise privileged communications relevant to the issue of damages would pose any meaningful threat to fairness interests. First, we see no real advantage that MMI might gain by possible "selective use" of the one communication it has disclosed in this subject area. Our relative confidence on this score is inspired in part by the fact that the question asked and the answer provided are so basic to the law of intellectual property that every competent lawyer would be familiar with this matter in any event.

Moreover, there is nothing obviously self-serving, or inaccurate, or remotely subtle in the disclosed communication. Nor can we understand how our refusal to compel MMI and its counsel to disclose all other communications between them relevant to the issue of damages would impair Teledyne's ability, through its counsel, to fully, fairly and effectively litigate the merits of the damages issues in this suit. In short, neither the one disclosure described above nor anything else persuades us that Teledyne needs access to MMI's confiden-

tial communications in order to prosecute effectively the damages aspects of this case. Accordingly, we find that MMI has not waived its attorney-client privilege for communications that relate to damages.

In sum, we fix the boundaries of the subject matter of the waiver by MMI through April 16, 1990, as follows: (1) all communications from lawyer to client or from client to lawyer that relate to the validity, enforceability, or infringement of the patent in suit, and (2) all documents "relating or referring to, constituting, or supporting," (Brown letter of September 25, 1990), and all documents contributing to "the basis of" (MMI's response to Teledyne's second request for production of documents) opinions communicated by lawyers for MMI to personnel at MMI relating to the validity, enforceability, or infringement of the patent in suit.

### C. *Scope of Waiver for the Period after April 16, 1990.*

MMI argues that waiver of the attorney-client privilege should be limited in time to communications "within a few months" of when MMI first learned of the Teledyne patent. This position is based in part on the view that in determining whether an alleged infringement was willful, the law requires the trier of fact to confine its inquiry to a relatively short period after the defendant (here counter-defendant) learns about the existence of the patent in suit. Under this theory, a party who learns about a patent that it might be infringing must make a reasonable inquiry to determine, in good faith, whether it is in fact infringing. Further, under this theory, if the potential infringer makes such an inquiry and if the information and advice it receives would lead a reasonable person to conclude that its continued business activity would not invade enforceable rights held by another, then there can be no finding of willfulness, regardless of what information

or opinions the potentially infringing party receives later and regardless of any change in the subjective state of mind of that party. Therefor, the argument goes, communication between counsel and client after this initial period are irrelevant and not discoverable. MMI cites no authority for this argument.

Similarly, Teledyne has cited no cases that squarely support the position it takes, i.e., that MMI's waiver extends past April 16, 1990 up through trial of this matter and that the subject matter scope of MMI's disclosure obligation remains constant (and broad) throughout both periods.[1] Without clear guidance from the case law, or even a crisp formulation of the issues by counsel, we are constrained to venture into uncharted waters and to reason about these issues from basic principles.

■ To think about these issues reliably, we believe that it is important to begin by identifying the relevant duties that patent law imposes on persons whose sale of products might invade the rights of another. The law makes it clear that a party who learns that someone else owns a patent that might be infringed by that party's products has a duty to make a reasonable effort to determine whether continued sale of those products would offend rights held by the other person under the patent. See, e.g., *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1109 (Fed.Cir.1986). It is much less clear, however, whether this is the full extent of the duty the law imposes.

On the one hand, we have seen nothing in the cases that suggests that, after making one competent, good faith determination that he is not invading another's rights under a patent, a party has a *continuing* duty to repeat or extend his examination of the issues triggered by the existence of the patent. No case of which we are aware suggests, for example, that a party must

---

1. Cf. *Smith v. Alyeska Pipeline Service Co.*, 538 F.Supp. 977 (D.Del.1982), where the court refused to put a time limitation on waiver of the attorney-client privilege. In *Alyeska*, however, the waiver was not based on invocation of the advice of counsel defense, but on a voluntary disclosure by former counsel to plaintiff of his initial opinion letter. The court did not rule that the waiver by the former counsel reached communications on the same subjects by subsequently retained trial counsel.

re-visit the issues raised by the existence of the patent at periodic intervals, or must direct his counsel to re-think the matter, or to continue to look for information or theories that might shed additional light on the matter or lead to a different conclusion.

On the other hand, we strongly suspect that *if* a party who had earlier completed a good faith examination of the matter happened later to learn new information or to receive different legal advice, the effect of which would be to clearly show a reasonable person that continued sales of his products in fact would offend enforceable rights held by another under the patent, then, at that juncture, the party who had received the new information or different advice would be under a duty to stop selling the offending products. In other words, we believe that if a plaintiff could show that at *any* point prior to trial the defendant had received information or advice that clearly should have shown the defendant that selling his products invaded enforceable rights held by the plaintiff under a patent, then, from that point forward, the defendant would be exposed to enhanced damages for willful infringement. The focus of the legal inquiry is on the state of mind of the defendant, and we see no reason to conclusively presume that that state of mind, once set in one direction, could not or should not change.

Under this view of the law, and the duties it imposes on parties defending against suits based on patent rights, a party who invokes the advice of counsel defense to an allegation of willfulness should be compelled to disclose, from the period after completion of the initial good faith examination of the issues raised by learning of the existence of the patent, new and different communications from counsel (whether consisting of advice, information, or some combination thereof) that clearly would have led a reasonable person in the defendant's position (objective standard) to conclude that selling his products would invade rights held by another under a patent. Given the nature of the duty, and the facts of litigation life, there is no justification for requiring disclosure of subsequent communications from counsel that merely reinforce or repeat the opinions originally offered, or that differ from those initial opinions in some particulars or nuances but that do not change the bottom line, i.e., that would not clearly lead to the conclusion that continued sales by defendant of his products would in fact invade plaintiff's rights. We want to be careful not to impose duties of disclosure that unjustifiably encroach on the relationship between attorney and client or that reinforce the lamentable and already exaggerated tendency of lawyers in these fields to spend more time trying to mine opposing counsel's mind than developing the real world facts on which disposition of these cases primarily should turn.

Thus, what we order MMI and its counsel to disclose, from the period after April 16, 1990, is limited to *advice of counsel or information from counsel as to which both of the following are true: (1) the advice or information differed materially from advice or information received prior to that date, and (2) in context, the new and different advice and/or information is of such a character that it clearly would have led a reasonable person in MMI's position to conclude that selling its products would invade enforceable rights held by Teledyne under the patent in suit.*

## IV. The Propriety Of Counsel For MMI Instructing Witnesses Not To Answer Deposition Questions Based On Attorney–Client Privilege.

Purporting to invoke the attorney-client privilege, counsel for MMI interposed objections and instructed deponents not to answer questions approximately 60 different times during depositions of Mr. Lombardi and Mr. McCormick, both taken *after* September 25, 1990, the date of the letter from counsel for MMI expressly waiving the privilege with respect to communications concerning validity, enforceability or infringement. A very substantial percentage of these questions sought information about communications that occurred prior to April 16, 1990, communications from Mr. Smegal, counsel for MMI, to MMI person-

nel, about infringement, validity, or enforceability of the patent in issue. For example, during the October 30, 1990 deposition of Mr. McCormick, counsel for Teledyne asked: "Did Mr. Tom Smegal ever give you an opinion as to whether he thought McCormick–Morgan infringed Teledyne's patent?" Promptly after that question was posed, counsel for MMI interjected the following objection and instruction: "Objection. Same attorney-client privilege. Instruct the witness not to answer." (page 18 of depo. transcript). When counsel for Teledyne rephrased the question, to ask for the content of the communication rather than simply whether a communication on this subject had ever occurred, counsel for MMI repeated his objection and instruction not to answer. *Id.* Moments later, during the same deposition, counsel for Teledyne attempted to ask Mr. McCormick about a letter of November 30, 1989, from Mr. Smegal to William Sewalk, President of McCormick–Morgan, a letter that discussed the issues of validity and enforceability at length *and that counsel for MMI very recently had voluntarily disclosed to Teledyne pursuant to the waiver MMI had made in connection with its invocation of the advice of counsel defense.* For reasons totally unfathomable by the court, counsel for MMI instructed Mr. McCormick not to answer any questions about this document or about any communications from counsel made in connection with it. These instructions were totally unjustified.

After the fact, in an anemic effort to justify conduct that is patently unjustifiable, counsel for MMI has suggested that one of the reasons for the instructions not to answer was that at least some of the questions posed by counsel for Teledyne were too broad. This is a woefully inadequate effort to construct a belated excuse. First, many of the questions posed by counsel for Teledyne fell clearly within the boundaries of the waiver that recently had been made, twice in writing, by MMI. Second, even if some of the questions arguably sought information about some communications that would not be discoverable under this opinion (and therefore could be construed as "overbroad"), the professionally appropriate response clearly is *not* an instruction not to answer, but a sensible effort to suggest the boundaries (in scope of subject matter and/or time period) within which questions would be appropriate, followed by an instruction to the witness to provide full information within those areas.

We hold that there was no justification for a large percentage of the instructions not to answer during the depositions of Mr. McCormick and of Mr. Lombardi. It follows that the behavior by counsel for MMI caused counsel for Teledyne to waste an appreciable amount of time posing questions and arguing (unsuccessfully) about MMI's objections. It also follows that it will be necessary to reconvene those depositions, forcing counsel for Teledyne to repeat some of their preparation work. Under these circumstances, we feel compelled by the law (Rules 26(g) and 37 of the Federal Rules of Civil Procedure) to impose sanctions on counsel for MMI. These sanctions shall take two forms. First, the depositions of Mr. Lombardi and Mr. McCormick shall be re-convened in Los Angeles at the offices of counsel for Teledyne (it presumably goes without saying that these deponents, and all other persons privy to communications made discoverable by this opinion and order, shall disclose fully and truthfully all the information they have about such communications). Second, to defray the cost of the repeated preparation and deposition time by counsel for Teledyne, counsel for MMI shall pay Teledyne, by way of additional sanction, $500.00.

V. The Most Appropriate Means For Pretrial Disclosure Of The Parties' Contentions In This Case.

 In this section we respond to MMI's motion for a protective order prohibiting Teledyne from using depositions taken under the authority of Federal Rule of Civil Procedure 30(b)(6) for the purpose of detailing the bases for the contentions made and the positions taken by MMI in this case. Initially, we note that under F.R.C.P. 26(c)(3) the court has the power to order that discovery "may be had only by a

method ... other than that selected by the party seeking discovery".

One purpose of the depositions that Teledyne noticed under F.R.C.P. 30(b)(6) was to acquire relevant information of a percipient character from MMI. Within the bounds of relevancy, that purpose was appropriate and, as we understand it, MMI did not object to producing witnesses to provide the information of this kind that was within the "knowledge" or "control" of the corporate party (MMI) and its agents. It appears, however, that Teledyne also sought to use the 30(b)(6) depositions as at least one discovery vehicle for learning the bases for the contentions made and for the positions taken (including all affirmative defenses) by MMI. MMI objected to using 30(b)(6) depositions for this latter purpose in this case. That objection apparently had two principal predicates. The first sounded in fairness. MMI was afraid that Teledyne was attempting to build a record that Teledyne could later unfairly use (e.g., in a motion for summary judgment, or to embarrass a witness on cross examination at trial). In particular, MMI was afraid that Teledyne would demand that a human being who had been designated as a 30(b)(6) witness set forth in full detail every item of evidence and every aspect of legal argument or authority that had any tendency to help support any position (factual or legal) MMI was taking in the litigation. MMI believes that in a very complex, highly technical lawsuit like this, no human being (especially a non-lawyer) could reliably and completely set forth this material. That being the case, MMI feared that Teledyne would later try to use the transcripts of these depositions to limit the evidence and arguments Teledyne could present, or to argue, as on a motion for summary judgment, that there were insufficient bases for one or more of the contentions MMI was making or the positions MMI was taking.

The second basis for MMI's objection, as we reconstruct it, sounded in considerations of efficiency and common sense. MMI argued that in a case like this by far the most reliable and complete discovery vehicle for setting forth the bases (in evidence, events, and law) for a party's contentions and positions would be a set of responses, written after the close of virtually all other discovery, to sensibly framed contention interrogatories. MMI suggests that there is no justification for pursuing this kind of information through more than one discovery tool; it makes no sense, they urge, to waste the time and money that would be involved in exploring the same topics through both a set of 30(b)(6) depositions and through a set of contention interrogatories. While there might be some circumstances in which pursuing the same kind of information, or exploring the same subjects, through more than one discovery tool could be justified (e.g., where credibility issues were pivotal, or the information sought was of such an elusive and important character that fair explication of it would require probes from more than one direction and in more than one form), we have seen no such justification in this case.

Since we can see no reason to permit the parties in this case to pursue the kind of information we are talking about here through more than one discovery device, the question to which we turn now is: which of the available devices is most appropriate, i.e., which device would yield most reliably and in the most cost-effective, least burdensome manner information that is sufficiently complete to meet the needs of the parties and the court in a case like this?

Even though we have expressed considerable skepticism about the appropriateness of the use of contention interrogatories at earlier stages of litigation generally, and in other kinds of cases, see *In re Convergent Technologies Securities Litigation,* 108 F.R.D. 328 (N.D.Cal.1985), we find ourselves persuaded by MMI's arguments in the particular setting of this case. First, we are concerned that in a case like this, no one human being can be expected to set forth, especially orally in deposition, a fully reliable and sufficiently complete account of all the bases for the contentions made and positions taken by a party like MMI (or Teledyne).

Secondly, we are concerned about asking a non-lawyer to undertake this kind of

task. In a patent case like this, the bases for contentions do not consist exclusively of relatively straightforward facts or evidence, as might be true, by contrast, in a case arising out of a traffic accident. In other words, to set forth the bases for contentions in this case, it is not enough to describe real world facts and events, even in considerable detail. Rather, determining what the bases for contentions are in this environment involves complex judgments about the relationship between at least three kinds of things: (1) evidence/facts/events in the real world (outside litigation), (2) "claims" as particularly set forth in the patent in issue and in other patents or other material presented to the patent office, and (3) principles of intellectual property law set forth in statutes and in judicial opinions. A non-lawyer deponent might have great knowledge about the products in issue here, but be quite ill-equipped to reason reliably about the legal implications of the relationship between those products, or their components, and the various claims of the patent in suit or of other patents or prior art. Patent cases turn peculiarly on a conceptually dense dynamic between physical objects, words in claims, and principles of law. Understanding that dynamic, and describing the relationships that serve as the bases for a given parties' contentions, is something best done by patent lawyers, and best done after at least most other discovery has been completed. After all, in cases like these, a substantial part of "the bases for contentions" really consists of *quasi-legal argument.*

We presume here that the answers to contention interrogatories in a case like this are in fact written by lawyers, not parties. Parties, of course, provide substantial input, but they cannot be expected to have the range of understanding of patent law or of proceedings in the patent office to reliably identify and accurately articulate all of the predicates for their legal positions.

As we have written elsewhere, in many settings going through the trouble of writing answers to contention interrogatories cannot be justified, e.g., because the contentions are not especially subtle or complex and the evidentiary and legal bases for them either are obvious or already have been made pretty clear in other ways. In a case like this, however, it is more persuasively arguable that going through the hard work of answering contention interrogatories, at the end of the discovery period, is justified because by doing so counsel can set the case up for serious settlement negotiations or for a streamlined and rational trial.

We also feel constrained to acknowledge that in many settings and cases contention interrogatories yield precious little useful information, in part because the lawyers who craft the responses seem to assume that it is their professional responsibility to be as stingy and self-serving in the answers they write as a strained view of the English language and the proper bounds of legal ethics permit. That apparent fact of litigation life makes us pause, to say the least, before ruling, even in the limited circumstances of this case, that the most appropriate vehicle for disclosing the kind of information and argument at issue here is a sensibly crafted set of contention interrogatories. We have decided to respond to this concern, however, not by ordering that the discovery in question be pursued through some even less appropriate device, but by ORDERING MMI, as a condition to the granting of the protective order it seeks (prohibiting the use of 30(b)(6) depositions for purposes of setting forth the bases for MMI's contentions), to respond in full, forthcoming detail to the interrogatories that Teledyne will serve as a result of this order. Moreover, since these interrogatories need be answered only after all other substantive discovery has been completed, we HEREBY RECOMMEND to the trial judge that he refuse to permit MMI to introduce at trial, in the form of evidence or argument, any matter not set forth in the answers to the soon to be forthcoming contention interrogatories.

On our own motion we go one step further, in the interests of fairness and cost-effective trial preparation. We HEREBY ORDER Teledyne to respond under identi-

cal rules and potential sanctions to a set of sensibly crafted contention interrogatories, should MMI choose to serve such a set, after the other discovery in this case is essentially completed.

For all the reasons set forth above, we hereby ORDER that neither party to this action may pursue the bases for the other's contentions through 30(b)(6) depositions, but, instead, may use appropriately framed and timed contention interrogatories for this purpose. This does not mean, of course, that MMI may refuse to provide percipient type information that is sought through depositions or that it may refuse to respond to questions about communications between client and counsel that fall within the boundaries described in earlier sections of this opinion.

IT IS SO ORDERED.