**ADVANCED CARDIOVASCULAR SYSTEMS, INC., Plaintiff,**

v.

**C.R. BARD, INC., Defendant.**

**No. C90–0503 FMS (WDB).**

United States District Court, N.D. California.

Oct. 5, 1992.

Richard Bardin, Fulwider, Patton, Lee & Utecht, for plaintiff.

John Sweeney, Desiree Broderick and Michael Murray of Morgan & Finnegan and Steve Taylor, Kindel & Anderson, for defendant.

## OPINION AND ORDER RE MOTION TO COMPEL DISCOVERY

### BACKGROUND

BRAZIL, United States Magistrate Judge.

We address here defendant C.R. Bard's motion to compel (1) disclosure of communications between inventors and their patent counsel made in anticipation of filing the application of the patent in issue and (2) testimony by inventors and their patent counsel setting forth directly their understanding of several key technical phrases used in the patent claims.

The principal purpose of defendant's motion is to compel both the inventors and their patent counsel to disclose communications that preceded and accompanied the drafting by counsel of the application for the patent in suit and that occurred in connection with a subsequent reexamination proceeding. At least some of these communications, according to defendant, involved primarily or exclusively technical information. Drs. John B. Simpson and Edward W. Robert were the inventors of angioplasty balloon catheters described and claimed in United States Patent No. 4,323,-071 (the "Simpson–Robert Patent"). Harold C. Hohbach is the patent lawyer who drafted the initial patent application. Edward J. Lynch is the lawyer who represented the inventors in the re-examination.

Plaintiff asserts that the attorney-client privilege protects the disputed communications from discovery. While their dispute reaches other communications from inventors to patent counsel, defendant seems primarily interested in learning what the inventors told their lawyers about the meaning of several key phrases that eventually appeared in the patent claims: "integral," "formed integral therewith," "formed therewith," and "formed therein." Plaintiff insists that the attorney-client privilege protects from discovery the private communications from inventor to patent counsel about the meaning of these phrases.

A second dispute between the parties revolves around plaintiff's refusal to permit the inventors to testify about their understanding of the meaning of these same key phrases. Plaintiff opposes defendant's discovery of these understandings on the grounds that such questions impermissibly require the inventors to articulate "conclusions of law."

For the reasons set forth below, we hereby DENY that part of defendant's motion that seeks disclosure of communication by the inventors to their patent attorneys. We hereby GRANT that part of defendant's motion that requests us to order the inventors to disclose their understanding of terms used in the patent claims.

## PRIVATE COMMUNICATIONS IN ANTICIPATION OF FILING THE PATENT APPLICATION

The core issue raised by defendant's motion to compel is this: should the attorney-client privilege presumptively attach to communications that are made in private between an inventor and his or her patent attorney prefatory to the filing of an application for a patent?

The undersigned addressed this question in passing in a published opinion several years ago. *See Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 116 F.R.D. 533, 542

(N.D.Cal.1987). That opinion reflected no awareness that there was then, and remains today, a clear division of authority on this important issue. Apparently ignorant of the line of cases associated most visibly with *Knogo Corp. v. United States*, 213 U.S.P.Q. 936 (Ct.Cl.1980), this court accepted the rulings in *Jack Winter, Inc., v. Koratron Co.*, 54 F.R.D. 44, 46–47 (N.D.Cal.1971) and *Hercules Inc. v. Exxon Corp.*, 434 F.Supp. 136, 147–148 (D.Del. 1977), that the attorney-client privilege generally should not protect communications from inventors to their lawyers when the communications consist largely of technical information counsel would need in preparing an application for a patent.

Two rationales informed the rulings in *Jack Winter* and *Hercules*. One was that an attorney who was using technical information to prepare a patent application was primarily providing a business service rather than offering legal advice or providing legal services. *Jack Winter*, 54 F.R.D. at 47; *Hercules*, 434 F.Supp. at 147. The second rationale was that an inventor who provided counsel with technical information in connection with an anticipated application for a patent would expect the attorney to pass that *information* along to the United States Patent and Trademark Office (the "PTO") (in part because the inventor would expect his *application to contain* technical information and in part because the inventor was assumed to understand that he and his counsel had a legal obligation of candor and full disclosure to the PTO). It followed, according to these courts, that the inventor in this setting would have no expectation that the information would remain confidential. Under this second rationale, counsel is assumed to serve as little more than a conduit (from inventor to PTO) for technical information. This assumed absence of an expectation of confidentiality was deemed fatal to a claim of privilege. *Jack Winter*, 54 F.R.D. at 47; *Hercules*, 434 F.Supp. at 147.

Constrained to rethink these issues in order to rule on defendant's motion in the case at bar, and having been made aware by counsel for plaintiff of the well-reasoned competing line of authority best reflected in *Knogo, supra*, this court now reverses that portion of its earlier opinion that accepted the *Jack Winter* line of authority. Having considered the matter in greater depth, and having read all the relevant cases that we could find, we now reject the notion that the attorney-client privilege should not attach, presumptively, to private communications from inventor to lawyer that consist primarily of technical information related to an anticipated patent application.

Before explaining the principal bases for this reversal, we emphasize some important related points. First, what the privilege presumptively protects from discovery is specific *communications* between client and counsel, *not* the relevant underlying facts, data or information. Thus, the kind of information that the *Jack Winter* and *Hercules* courts were concerned about making available to opposing parties and to the trier of fact ("technical information such as the results of research, tests, and experiments")[1] will remain available, even if certain *communications* which include that information are presumptively privileged. In other words, opposing parties will remain free to discover, directly from the inventor, all the technical information the inventor had about the invention, all the results of tests the inventor performed, or had performed, all the documents related to experiments with the invention, everything the inventor knew about prior art, etc. The effect of the privilege only would be to block access to that kind of information indirectly, by blocking access to the private communications between inventor and patent lawyer.

Second, the view once held by several courts, *see, e.g., McNeil–PPC, Inc. v. Procter & Gamble Co.*, 136 F.R.D. 666, 669–70 (DC Dist.Colo.1991);[2] *Howes v.*

---

**1.** *Hercules Inc. v. Exxon Corp.*, 434 F.Supp. 136, 147 (D.Del.1977).

**2.** *McNeil* contains a useful summary of cases that follow *Jack Winter* and, separately, of the cases in the *Knogo* line. One factor that moved

*Medical Components Inc.*, 7 U.S.P.Q.2d 1511, 1512 (E.D.Pa.1988); *Ashland Oil Inc. v. Delta Oil Products Corp.*, 209 U.S.P.Q. 151, 152–53 (E.D.Wis.1979); *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 39 (D.Md.1974); *Jack Winter, Inc. v. Koratron Co.*, 54 F.R.D. 44, 46 (N.D.Cal.1971), that the attorney-client privilege cannot attach to communications or documents generated in connection with proceedings before the PTO has clearly been rejected. *Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 202 (E.D.N.Y.1988); *FMC Corp. v. Old Dominion Brush Co.*, 229 U.S.P.Q. 150, 151 (W.D.Mo.1985); *Knogo Corp. v. United States*, 213 U.S.P.Q. 936, 940–41 (Ct.Cl. 1980); *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 377, 388 (D.C.Dist.Colo. 1978); *Eutectic Corp. v. Metco, Inc.*, 61 F.R.D. 35 (E.D.N.Y.1973); *Natta v. Zletz*, 418 F.2d 633 (7th Cir.1969).[3]

Thus the great weight of current authority is that the privilege may attach to such communications. Significantly, a principal consideration informing this change in the majority view has been an acknowledgement that helping an inventor prepare a patent application and prosecute a patent can involve at least some work that is fairly characterized as lawyering. *Knogo*, 213 U.S.P.Q. at 940–41; *In re Ampicillin Antitrust Litigation*, 81 F.R.D. at 388; *Natta v. Hogan*, 392 F.2d 686, 692–93 (10th Cir.1968). It also is important to note that the *Jack Winter* and *Hercules* courts squarely acknowledged that under modern doctrine privilege may attach to communications made in connection with proceedings before the PTO, that both courts went to some lengths to afford protection to some kinds of communications between in-

ventor and lawyer, and that both courts emphasized that the principal exception that they were creating to the general rule was quite limited, attaching only to "technical information communicated to the attorney but not calling for a legal opinion or interpretation and meant primarily for aid in completing patent applications." *Jack Winter, supra*, at 47.

We turn now to explain why we have reversed our earlier view about whether the privilege should attach, presumptively, to private communications from inventor to counsel that consist primarily of technical information and that are made in connection with the preparation or prosecution of a patent application. Why, in a phrase, do we join the *Knogo* camp and desert *Jack Winter*? While several factors inform our decision, the heart of the matter revolves around our hopefully maturing perception of the realities of the patent application process. We view that process as fundamentally dialectical and, in very important respects, legal. In the first and most relevant instance, the dialectic is a private one between an inventor and his or her patent lawyer. The inventor usually brings to the dialogue little reliable legal knowledge but much technical information about the product or process and some information about prior art. The lawyer brings to the dialogue an understanding of (among other things) the criteria used by the PTO in deciding whether to issue patents and of the legal principles or considerations that come into play when parties seek to enforce a patent against an alleged infringer or to challenge a patent's validity.

the *McNeil* court to endorse the reasoning in *Jack Winter*, however, was the court's perception that attorney representation in cases of patent applications

"is dissimilar to other types of attorney representation where disclosure between the client and attorney may be hindered by the clients fear of subjecting him or herself to liability." *McNeil, supra* at 670. We are not comfortable accepting this suggested distinction at face value. While inventor and patent counsel have a duty to disclose all material information about the patentable invention to the PTO, *see* 37 C.F.R. § 1.56(a), they must make judgments

about what information is "material" and they presumably understand that they run the risk of being accused of committing fraud on the PTO if their judgments are not defensible. We develop related aspects of this theme in the text, *infra.*

3. The *Natta* court rejected the notion that the disclosure policies of the patent laws necessarily "preclude the proper application of the attorney-client privilege." *Natta, supra*, at 636, citing *In re Natta*, 410 F.2d 187, 190–191 (3d Cir.1969) and *Natta v. Hogan*, 392 F.2d 686, 691 (10th Cir.1968).

In their private dialogue, inventor and lawyer attempt, as a team, to make judgments that are subtle and that have real legal dimensions and implications. One crucial aspect of the attorney's role is to help the inventor understand, among other things, how the PTO and the courts tend to think about the key concepts of invention and prior art. Counsel offers advice about the likelihood of the PTO issuing a patent at all. Simultaneously, counsel and the inventor must look past the issuance stage to possible lawsuits involving enforcement and validity.

In these not-equatable contexts, inventor and counsel must consider how broad to make the claims (a decision influenced by legal, business, and technical considerations). They are trying to carve out a protectable niche in an already crowded environment. In deciding where to carve, they are simultaneously attempting to be broad enough to maximize their position in the market but not so broad as to create an unacceptable risk of invalidity. They must make judgments about what to claim, which words to use in articulating the claims, which matters to emphasize, which arguable prior art to cite, etc. As the *Knogo* court emphasized, when lawyer and inventor make these judgments they *choose* between different alternatives. They select some items for inclusion and decide to exclude others. They chose certain words (instead of others) to articulate their claims and describe their product or process. These judgments are not simple, linear, technical undertakings. They are intellectually dense, and the density is both technical and legal. To appreciate that density, one only needs to consider the huge number of patents already on file, the increasing technical complexity of the subjects of patents, the subtlety of the distinctions and refinements that can exist among abstractly comparable products and processes, and the inherently arbitrary and elusive character of the process of selecting which words to attach to physical things (an arbitrariness and an elusiveness

that seem to increase in direct proportion to the complexity and subtlety of the physical things that are offered as potential subjects of patents).[4]

We also perceive at least a modest adversarial dimension to the patent application process. While we recognize that that process, at least at some stages, is usually *ex parte*, and that in part for that reason the law imposes on applicants a duty of candor and good faith disclosure, we also understand that the PTO requires applications to satisfy demanding standards before issuing patents and often rejects applications as initially presented, thus initiating (for the persistent applicant) what can become a multi-staged process of submissions, rejections with commentary, re-submissions, etc. Experienced patent lawyers anticipate this process. They understand that their role is to *persuade* the PTO to issue the patent, and that the process of persuasion may well take the form of an elaborate debate, waged through a series of exchanges of dense writings. Thus it seems naive to suggest that there is no adversarial dimension to this process—or that the dialogue between counsel and inventor is unaffected by that dimension.

This perception of the reality of the process of crafting an application for a patent challenges the assumptions that underlie the rule adopted in *Jack Winter* and its progeny. The first of those assumptions was that the lawyer working in this environment primarily provides business rather than legal services. While business considerations can play a role in some of the judgments made as the patent application is prepared, presumably the inventor/client, not the patent lawyer, pulls the lead oar in identifying and ascribing weight to such considerations. The role that the lawyer can be expected to play, by contrast, is primarily legal. The inventor looks to the lawyer to understand the procedural and substantive legal requirements (e.g., the scope and character of the duty of disclosure) for issuance of a patent, as well

---

**4.** We recognize that there is a range of complexity among patentable subjects, but sometimes subtle drafting and interpretive decisions can be required in preparing applications even for products that seem relatively straightforward.

as the criteria the law recognizes as relevant in enforcement and validity litigation. The inventor expects the lawyer to understand how a patent examiner is likely to reason about such quasi-legal concepts as obviousness. The client pays the lawyer primarily for advice about these kinds of legal matters, not primarily for advice about business or technical matters.

Our perception of the realities of the patent application process also leaves us unpersuaded that inventors can be said to have no expectation of confidentiality with respect to communications to their patent attorneys that primarily contain technical information. We begin our consideration of this issue with the *Knogo* court's reminder that the law of attorney-client privilege has long recognized a presumption that a client expects his or her communications to remain confidential if they are made "without the presence of strangers." *Knogo, supra,* at 939, quoting *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 357 (D.Mass.1950). To adopt the opposite presumption would threaten evisceration of the privilege and raise the spectre of endless satellite litigation inspired by hope that holders of the privilege would not be able to prove what their expectation was, or even that they had one.

As significant for present purposes, we believe that the nature of the dynamic between inventor and patent lawyer as an application is prepared supports an inference that the inventors assume that their private communications with counsel will remain confidential. Again we emphasize that what we are focusing on is *expectations about communications, not* expectations about substantive *technical data itself.* We think it fair to assume that inventors enter these private conversations with their lawyers knowing that the lawyers know a lot more than the inventors do about what kind of information the law makes relevant and useful in the application process. We also believe it fair to assume that the inventors do not expect counsel to include in the application every shred of technical information that the inventor shares in private with counsel. Instead, inventors are likely to anticipate a dialectical process in which some information is selected for inclusion in the application and some is rejected.

Moreover, inventors may well appreciate that there are different ways (different verbal packages) to describe aspects of their invention, and that there will be give and take between counsel and inventor to identify those words and phrases that promise to contribute most to the complex of objectives involved in this process (e.g., maximizing the odds that the PTO will issue the patent while securing a patent that simultaneously delivers the most market mileage and is least vulnerable to an invalidity attack). These conversations about which choices to make in order best to advance the inventor's interests are in some ways essentially tactical. It is extremely unlikely that an inventor would expect such conversations to be divulged to anyone. Thus we think an inventor is likely to expect to engage in much more communication with counsel than would ever be exposed to the PTO in the application process. In this respect, the inventors expectations would seem to parallel the expectations of a prospective litigant who confers at length with counsel prior to the drafting of a complaint to launch civil litigation. The law presumes that such a litigant expects his or her communications with his or her lawyer to remain private, even though that same litigant understands that some of the factual material he or she shares with counsel will end up in the complaint.

■ Counsel for defendant might offer the rejoinder that there is a crucial difference between private, pre-filing conversations in civil litigation and the private conversations that precede filing a patent application. That difference, defendant would argue, is attributable to the duty of candor and disclosure that is peculiar to the patent application process. There are, of course, duties of disclosure and good faith in civil litigation, *see e.g.,* Rule 11 of the Federal Rules of Civil Procedure and Rule 3.3 of the ABA Model Rules of Professional Conduct, but they may well not have the

same reach as the duties imposed on patent applicants. Under the relevant federal statutes and regulations, applicants owe a duty of candor and good faith toward the Patent and Trademark Office. 35 U.S.C. §§ 111, 112; 37 C.F.R. § 1.56(a); *see also, Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945) (patent applicant owes duty of candor and obligation of frank and truthful disclosure to PTO). These duties, while real and substantial, are not boundless. As the Court of Appeals for the Fifth Circuit noted in *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 460 F.2d 1096, 1102–03 (5th Cir.1972), the duty of full, frank disclosure does not require that the applicant "list the full spectrum of his knowledge to establish his bona fides." Rather, the duty is to disclose information that would appear to be material. 37 C.F.R. § 1.56(a). "Materiality" is by no means a self-defining concept, especially when the subject of the patent is complex or subtle. Inventors and their patent lawyers can be expected to have, in complete good faith, substantial private dialogue aimed at determining which of a wide range of possible information is in fact "material" and thus subject to the duty to disclose. We believe that inventors would reasonably expect these kinds of private conversations to remain confidential. It is simply a non-sequitur to suggest that because the inventor knows that at some juncture he will be required to disclose "material" *information* to the PTO he cannot expect his earlier private *conversations* with his counsel, conversations whose purpose is to determine which information is material, to remain private. There simply is no equation between disclosing material information and disclosing conversations.

For all the reasons set forth above, we conclude that the *Knogo* court's characterization of the process of preparing a patent application, and of the role of counsel in that process, is much more realistic and accurate than the characterization that appears to have informed the reasoning in *Jack Winter* and its progeny. More specifically, we do not believe that patent counsel

usually serve primarily as conduits, even of technical information. Instead, we believe that inventors and their patent lawyers often engage in quite substantial private dialogue as part of the process of shaping and focusing a patent application, and that it is reasonable for them to expect that dialogue to remain confidential.

■ Therefore, the communications from inventor to patent lawyer, even those that are entirely technical, remain presumptively protected by the attorney-client privilege. We would consider ordering these communications disclosed only on a very compelling showing, e.g., that despite the presumption of confidentiality, the inventor in fact expected specific communications he or she made to patent counsel to be disclosed, without editing, to the PTO. Because no such showing has been made in this case, we DENY defendant's motion to compel to the extent that it would reach private communications between inventor and counsel made in connection with the preparation of the original patent application or in connection with the reexamination.

### THE PARTICIPANTS' UNDERSTANDINGS OF KEY TERMS IN THE CLAIMS

We turn now to defendant's request that we order the inventors and their patent counsel to disclose their understanding of terms used in the patent claims.

■ To the extent that patent counsel's understanding of the key terms was based on protected communications from the inventors, the reasoning set forth in the preceding section puts such matters beyond the reach of discovery. If patent counsel had an understanding of the phrases in question that was not based on privileged communications from the inventors, that understanding would be discoverable. The objection that testimony about the meaning of such terms would call for a "legal conclusion" is not meritorious; it is well-established that witnesses may offer testimony about ultimate issues, even when those ultimate issues involve legal concepts. *See*

Federal Rules of Evidence 701–704 and Federal Rule of Civil Procedure 33(b).

We perceive no basis for depriving defendant of full access to what the inventors themselves thought the key phrases in their patent claims meant. The inventors are competent to offer testimony on this subject. It obviously is relevant. They cannot claim that their understanding (as opposed to their private communications with counsel) is protected by privilege or as work product. The fact that testimony on these subjects might involve statements that could be characterized as "legal conclusions" is, for the reasons set forth in the preceding paragraph, not a sufficient basis for blocking access to this information. We therefore GRANT defendant's motion to compel to the extent that it asks us to ORDER the inventors to answer questions about their understanding of terms used in the patent claims.

IT IS SO ORDERED.

