**CellNET DATA SYSTEMS, INC., Plaintiff,**

v.

**ITRON, INC., Defendant.**

**No. C–97–20396 EAI.**

United States District Court,
N.D. California,
San Jose Division.

March 27, 1998.

---

David A. Ranheim, Devan V. Padmanabhan, Dorsey & Whitney, L.L.P., James H. Patterson, Sri K. Sankaran, Paul W. Stanga, Patterson & Keough, Minneapolis, MN, for Defendant.

Timothy N. Trop, Fish & Richardson P.C., Houston, TX, for Plaintiff.

## ORDER GRANTING DEFENDANT'S EXPEDITED MOTION TO COMPEL THE RESUMPTION OF THE DEPOSITION OF LARSH JOHNSON AND DENYING PLAINTIFF'S CROSS–MOTION FOR A PROTECTIVE ORDER

INFANTE, United States Magistrate Judge.

### I. INTRODUCTION

Defendant Itron, Inc. has filed an expedited motion for an order (1) compelling the resumption of the deposition of Plaintiff Cell-Net Data Systems, Inc.'s Chief Technology Officer, Larsh Johnson, and (2) overruling the objections raised by CellNet's counsel to certain questions related to the infringement, validity and interpretation of the claims of the patent-in-suit. The March 12, 1998 deposition of Mr. Johnson was suspended when the attorneys could not resolve their dispute regarding the propriety of the questions posed by Itron's counsel. CellNet has filed an opposition to Itron's expedited motion and submitted a cross-motion for protective order. CellNet's cross-motion requests an order precluding Itron from continuing Mr. Johnson's deposition because Itron's counsel improperly asked questions requiring Mr. Johnson to give legal conclusions. For the reasons set forth below, Itron's motion to compel is GRANTED and CellNet's cross-motion for a protective order is DENIED.[1]

---

1. The parties are advised that cross-motions and counter-motions, which are permitted in response to a regularly-noticed motion pursuant to Civil L.R. 7–3(c), are not authorized when the motion is brought on an expedited basis under Civil L.R. 7–10. *See* Civil L.R. 7–10(d). The Court has considered and ruled on CellNet's cross-motion in this case because it is in essence an opposition to Itron's motion to compel.

## II. BACKGROUND

This is a patent infringement case. The patent-in-suit is Plaintiff CellNet's U.S. Patent No. 4,783,623 ("the '623 patent"), entitled "Device for Use With a Utility Meter for Recording Time of Energy Use." Both Plaintiff CellNet and Defendant Itron manufacture and sell products for electric utilities. In this case, CellNet alleges that Itron's meter modules[2] (Model 40E Retrofit, Model 40ER, Model 40ER–1, and 40ER–1 (Version 2)) infringe claims 1, 5, 8, 9, 10, 12, 13 and 14 of the '623 patent either literally or under the doctrine of equivalents. Itron denies infringement and claims that the '623 patent is invalid.

On March 12, 1998, counsel for Itron took the deposition of Mr. Larsh Johnson, CellNet's Chief Technology Officer. Mr. Johnson is one of the named inventors of the '623 patent. During the deposition, Mr. Johnson testified that he played a prominent role in the patent application process. Mr. Johnson said that he worked directly and closely with CellNet's patent counsel and that he provided counsel with information about the invention. *Johnson Depo., 78:20–79:9 ("I believe we provided him [patent counsel] with samples of product and other information.").* Later, he explained that while other CellNet employees may have also assisted patent counsel during the application process, he was the "primary interface with patent counsel." *Johnson Depo., 80:12–22.* Finally, Mr. Johnson stated that he reviewed drafts of the patent application and written communications between CellNet's patent counsel and the PTO examiner. *Johnson Depo., 82:9–25.*

The dispute between counsel that resulted in the suspension of the deposition started when Mr. Padmanabhan, Itron's counsel, questioned Mr. Johnson about the meaning of certain terms in the '623 patent. The first line of questioning concerned Mr. Johnson's understanding of the term "any standard meter" in claim 1 of the '623 patent:

Q. (By Mr. Padmanabhan) Let's turn to claim 1. I would like you to focus on the language at the last element of claim 1, you can read the entire element to yourself and the language I'm focusing on is the phase "any standard meter."

A. Yes.

Q. What does that mean to you?

A. We had intended to be able to provide a module that would be able to retrofit to the multiple meters that were available in the industry at that point in time. So it refers to that collection of meters.

Q. So, would it be fair to say, then, the collection of meters you were trying to define with that term would be that the meter module would have to be able to mount on the D–5 meter type manufactured by Westinghouse Corporation, the I70S meter type manufactured by the General Electric Corporation, the MS meter type manufactured by Landis and Gyr, and the J–4 meter type manufactured by Sanagmo and all other similar meters having similar internal structure?

MR. TROP: Objection, calls for a legal conclusion, compound and complex, lacks foundation.

THE WITNESS: Again, without drawing a legal conclusion, our intent with the patent was to try and protect the ability to retrofit this device to multiple makers for various manufacturers that were in the market at that time. And that was pretty clearly what we set out to do.

Q. (By Mr. Padmanabhan) I don't think that quite answers my question.

MR. TROP: Listen, whether it answers your question or not, he gave you what he believes is an answer. You're not entitled to sit there and lecture him on what an appropriate answer is. He will give you what he believes to be a correct answer. You're entitled to try different approaches to it. You can't tell him what is and is not a correct answer.

---

**2.** Meter modules are attached to electric meters; they allow utility companies determine how much electricity its customers use. The '623 patent discloses a meter module design which allows the user to (1) attach the module to any standard electric meter (claim 1) and (2) determine the time of energy use so that utility companies can charge higher rates during times of peak usage and lower rates during all other times (claims 5, 8, 9, 10, 12, 13 and 14).

MR. PADMANABHAN: Could you read he last question back, please.

(The record was read by the Reporter.)

MR. TROP: He is not reasking the question. He is just asking it be read back.

MR. PADMANABHAN: I'm asking for a yes or no response.

MR. TROP: Objection, asked and answered. There is no reason for you to ask the same question; he will give you the exact same answer, stipulate to that.

MR. PADMANABHAN: It is a yes or no question.

MR. TROP: He is not answering the question again.

MR. PADMANABHAN: Are you going to instruct?

MR. TROP: If you're going to force him to answer the same question, we will terminate the deposition.

MR. PADMANABHAN: It's a yes or no.

MR. TROP: You cannot direct him how to answer the question. Move on.

MR. PADMANABHAN: It's my deposition.

MR. TROP: No, you can't sit there and insist he give you an answer you think is appropriate. He gave you the answer. If you don't like the answer, you can try and ask the question a different way. That's the answer. He stands by it unless he tells you he wants to change it.

*Johnson Depo., 91:13–94:6.* The attorneys also argued when Mr. Padmanabhan asked Mr. Johnson whether he believed the TOMM and SM–301 products are covered by claim 1 of the '623 patent.[3] The following is their exchange on the second line of questioning:

Q. (Mr. Padmanabhan) This morning we had discussed—you're going to want to keep Exhibit 8 in front of you—this morning we discussed the TOMM. Do you remember that?

A. Yes.

Q. Could you tell me, based on your knowledge of the TOMM, and your reading of claim 1 as you sit here today, does the TOMM fall within the scope of claim 1?

MR. TROP: That's plainly asking for a legal conclusion and I'm going to direct him not to answer that. That's plainly asking him a legal conclusion, completely improper.

MR. PADMANABHAN: It's completely proper. It is a factual basis.

MR. TROP: You're asking him to make a legal conclusion as to what the claims mean and make a legal analysis of how the claims mean and make a legal analysis of how the claims apply to the reference—to the product.

Q. (By Mr. Padmanabhan) Are you going to follow counsel's instruction?

A. Sure will.

MR. TROP: What I'll do, and we can delay it if you'll insist on an answer, I'll just stop the deposition. I think it's harassment to make him do what a patent attorney does. If you want to just stipulate that we'll push it to the end and I'll direct him—I'll stop it at the end, that's fine so you can go on. I don't want to stop your deposition right now. I think you have more legitimate questions.

MR. STANGA [Itron's other counsel]: If you've instructed him not to answer—

MR. TROP: I'll stop the deposition because it's harassing the witness to force him to try as an engineer to make a legal conclusion as to infringement and claim construction. It's a waste of his time to try and do it and it's improper harassment of the witness. If you're going to force him to answer, we're going to have to suspend the deposition.

MR. PADMANABHAN: Would that be your same instruction if I asked the same question with regard to SM–301, why SM–301 does not fall within the scope of claim 1 as you understand it today?

MR. TROP: Yes. Anything—if you're going to try to force him to do either a claim construction analysis or a patent infringement analysis, I consider that oppressive and unduly burdensome and I

---

3. Based on the record, it appears that the TOMM product is a CellNet meter module since it is not one of the identified Itron products accused of infringing the '623 patent.

would seek a protective order from the Court before requiring him to go on with that.

*Johnson Depo., 102:13–104:13.* After this exchange, Mr. Padmanabhan went on to another topic. However, he eventually returned to the topic of whether claim 1 of the '623 patent reads on the TOMM device. This tactic caused Mr. Trop, CellNet's attorney, to reiterate his objections and end the deposition. The following is the relevant exchange:

Q. Going back to the TOMM, do you feel that the TOMM as you know it is a device for use with an electric meter having a rotatable disk for recording energy use?

MR. TROP: I'm not going to let you do this, circumventing the same thing, trying to make him do an infringement analysis.

MR. PADMANABHAN: I want to bring to your attention to De Graffenreid versus the United States, for your information, which is 2 Claims Court 640, 1983, where the Court specifically said that asking questions on a claim limitation by claim limitation is allowed for an inventor.

MR. TROP: Can I look at that? I don't believe it's controlling law, but certainly look at it. I believe it would be distinguishable. If you could give me the cite, I'll look at it, grant a review and—

MR. PADMANABHAN: 2 Claims Court 640, 1983, I'm going to insist he answer the questions.

MR. TROP: We're going to suspend the deposition, then.

MR. PADMANABHAN: If that's what you want to do.

MR. STANGA: Your call.

MR. TROP: That's the end of the deposition and—

MR. PADMANABHAN: Until we resolve this issue.

MR. TROP: No, I'm suspending it. If you lose, that's the end of this deposition of the inventor.

MR. PADMANABHAN: Yes.

MR. TROP: Fair enough.

*Johnson Depo., 118:2–119:10.*

The attorneys apparently attempted to informally resolve their disagreement concerning the appropriate scope of examination, but were unable to do so. Plaintiff CellNet indicated that it would bring a motion for protective order regarding its objections to Mr. Padmanabhan's questioning of Mr. Johnson. Itron waited to receive CellNet's motion for protective order; after a few days passed, Itron prepared and filed the instant motion to compel. CellNet asserted its objections in its cross-motion for a protective order.

## III. DISCUSSION

### A. *Inventors May Be Compelled To Explain The Meaning Of Claim Terms*

The question of whether inventors may be required to testify about their understanding of words and phrases contained in the patent-in-suit was answered by the Court in *Advanced Cardiovascular Systems, Inc. v. C.R. Bard. Inc.*, 144 F.R.D. 372 (N.D.Cal. 1992). In *Advanced Cardiovascular*, the plaintiff refused to permit the inventors to testify about their understanding of the meaning of certain key phrases. *Id.* at 373. According to plaintiff, the questions posed by defense counsel were objectionable because "such questions impermissibly require the inventors to articulate 'conclusions of law.'" *Id.* The Court flatly rejected this contention, stating:

The objection that testimony about the meaning of such terms would call for a "legal conclusion is not meritorious; it is well-established that witnesses may offer testimony about ultimate issues, even when those ultimate issues involve legal concepts. " *See* Federal Rules of Evidence 701–704 and Federal Rule of Civil Procedure 33(b). [¶] We perceive no basis for depriving defendant of full access to what the inventors themselves thought the key phrases in their patent claims meant. The inventors are competent to offer testimony on this subject. It obviously is relevant. They cannot claim that their understanding (as opposed to their private communications with counsel) is protected by privi-

lege or as work product. The fact that testimony on these subjects might involve statements that could be characterized as "legal conclusions" is, for the reasons set forth in the preceding paragraph, not a sufficient basis for blocking access to this information.

*Id.* at 378–79.

The holding of the Court in *Advanced Cardiovascular* is entirely consistent with the ruling of the Court of Claims in *De Graffenried v. United States,* 224 U.S.P.Q. 787, 2 Cl.Ct. 640 (1983). In *De Graffenried,* the inventor was asked several probing questions by defense counsel about (1) the meaning of certain terms in the patent-in-suit, (2) what the patent-in-suit claimed that wasn't already found in the prior art, and (3) his opinions concerning infringement. *Id.* at 788, 2 Cl.Ct. 640. The inventor, who was also the plaintiff, refused to answer the questions posed by defense counsel on the ground that they improperly sought his legal opinions. *Id.* On the defendant's motion to compel, the Court of Claims overruled plaintiff's objections, stating:

> Although Mr. de Graffenried is a lay witness, he is the patentee of the patent in suit. He has worked extensively in the field of deep-bore machining, and has acted as a consultant to the Waterlviet Arsenal's machining operations. Moreover, in answering interrogatories, Mr. de Graffenried identified himself as knowledgeable of the contents of his patent and its infringement. Because he is technically conversant with the factual subject matter of this lawsuit, Mr. de Graffenried's opinions and inferences regarding his patent, the prior art and the alleged infringement would assist this court in developing a clear understanding of the facts in issue. Consequently, pursuant to Fed.R.Evid. 701(b), this court concludes that questions which elicit plaintiff's opinions regarding his '586 patent, its prior art, and its infringement, are proper deposition questions ... [¶] A patent is a technical document which the patentee is able to interpret. Consequently, the patentee shall be required to an-

swer questions about the technical substance of his patent.

*Id.* at 788–89, 2 Cl.Ct. 640. *See also Baxter International Inc. v. Cobe Lab., Inc.,* 794 F.Supp. 252, 254 (N.D.Ill.1991) ("[A]n inventor may reasonably be expected to be able to testify from an intimate association with the subject matter of the case and in many situations the inventor may very well be the person most qualified to testify as to the invention and as to its contribution to the area of knowledge involved in the art."); and *Nelco Corp. v. Slater Electric Inc.,* 80 F.R.D. 411, 415, 200 U.S.P.Q. 534 (E.D.N.Y.1978) ("Having fulfilled his statutory role by submitting the claims in his patent application, it can be said that the deponent clearly has had ample experience as an 'actor' upon which he can base interpretations of these claims.").

Under the above precedent, Itron's counsel was clearly entitled to ask Mr. Johnson to comment upon and explain the claim language in the '623 patent. Mr. Johnson is an inventor of the '623 patent and CellNet's present Chief Technology Officer. Moreover, the record clearly indicates that Mr. Johnson worked closely with CellNet's patent counsel in the drafting of the patent application and in formulating responses to office actions during the application process. Furthermore, Mr. Johnson admitted that he provided patent counsel with samples of the CellNet devices into which some or all of the patented technology was incorporated. Therefore, Mr. Johnson may be the person with the most knowledge on the subject of whether the claims of the '623 patent read on certain CellNet devices.[4]

Nor does the Court believe that Mr. Padmanabhan asked for more than Mr. Johnson's interpretation or understanding of the claim terms. For example, as to the first line of questioning discussed above, Mr. Padmanabhan was merely attempting to determine whether Mr. Johnson understood "any standard meter" to include the four identified types of meters. This question in no way required Mr. Johnson to conduct any type of "oppressive" infringement analysis. Mr. Padmanabhan was absolutely entitled to a

---

4. The record indicates that Mr. Padmanabhan did not ask Mr. Johnson to give his opinion

regarding whether any of *Itron's* meter modules infringe any claims in the '623 patent.

"yes", "no" or "I don't know" answer from Mr. Johnson. Instead, Mr. Johnson uttered an answer that was somewhat unresponsive to the proper question and when Mr. Padmanabhan noted that the comment was unresponsive, Mr. Trop unreasonably chided Mr. Padmanabhan and threatened to terminate the deposition.

Finally, the Court is not persuaded that the case cited by CellNet in support of its opposition and cross-motion for protective order, *McCormick–Morgan, Inc. v. Teledyne Industries, Inc.*, 134 F.R.D. 275 (N.D.Cal. 1991), is relevant to the issue presented herein. In *Teledyne*, the Court discussed the propriety of using Rule 30(b)(6) depositions to obtain discovery regarding contentions made by an opposing corporation:

> It appears, however, that Teledyne also sought to use the 30(b)(6) depositions as at least one discovery vehicle for learning the bases for the contentions made and for the positions taken (including all affirmative defenses) by MMI.

*Id.* at 286. The opponent of the requested Rule 30(b)(6) depositions, plaintiff MMI, argued that it would be both burdensome and inefficient to conduct such discovery, which it conceded was relevant, by deposition since no one employee would have the requisite knowledge to answer questions about all of the contentions stated in MMI's pleadings. *Id.* MMI said that it would be willing to provide the requested information in detailed responses to contention interrogatories. *Id.* Thus, the *Teledyne* case is easily distinguishable from this case because Mr. Padmanabhan did not attempt to question Mr. Johnson about the contentions raised by CellNet in its pleadings. He merely asked Mr. Johnson to testify about his understanding of the meaning of certain terms in the '623 patent.

## B. *Defendant Itron's Motion For Sanctions Is Denied*

■ Although the Court finds that Itron's counsel was entitled to question Mr. Johnson,

one of the inventors of the '623 patent, to explain certain terms in the patent and that Mr. Trop's conduct was improper, Itron's request for monetary sanctions must be denied because CellNet failed to comply with the notice requirements ·in Civil L.R. 7–10(b).[5] The record indicates that Itron did not inform CellNet of its intent to file the instant expedited motion to compel at least three days before it was filed on March 19, 1998. However, since Itron's counsel was wrongfully deprived of their opportunity to complete Mr. Johnson's deposition on March 12, 1998, he should not have travel again to California to complete the deposition. Therefore, the Court hereby grants Itron's request for an order compelling Mr. Johnson and CellNet's counsel to travel to Itron's attorneys' office in Minneapolis, Minnesota, for the resumption of the deposition. The parties may, however, stipulate to a different location for the deposition.

## IV. CONCLUSION

For the foregoing reasons, Defendant Itron's expedited motion to compel the resumption of Larsh Johnson's deposition is GRANTED and Plaintiff CellNet's cross-motion for a protective order is DENIED. Furthermore, Itron's motion for sanctions is DENIED.

IT IS SO ORDERED.

---

5. Civil L.R. 7–10(b) provides, "Unless excused by the judge, a moving party shall deliver notice to the opposing party of the date the party intends to make an expedited motion and the relief which will be sought. The date specified shall be no less than 3 days after the notice is delivered. In the notice, the moving party shall offer to, and unless declined, shall meet and confer with the opposing party at a reasonable time, place and manner for the purpose of attempting to resolve the matter."